Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
Colleen A. O'Neil, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company, and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,

                                Plaintiffs,

                -against-

STARRETT CITY MEDICAL, P.C.,  HILLCREST MEDICAL
CARE, P.C., AZU AJUDUA, M.D., LEONARD LUNA, D.C.,
FLATLANDS CHIROPRACTIC WELLNESS, P.C., KINGS
CHIROPRACTIC WELLNESS, P.C., GUO CHU WU, L.Ac.,
JEFF HARMONIZE ACUPUNCTURE, P.C., STACY
JUYOUNG MOON, L.Ac., SJM ACUPUNCTURE, P.C.,
LYUDMILA KRUPNOVA, L.Ac., LK ACUPUNCTURIST,
P.C., PASCALE LAWSON, L.Ac., PL ACUPUNCTURE, P.C.,
MOHAMED ELSAYED KHALLAF, HANDY PHYSICAL
THERAPY, P.C., IRINA KATAEVA, CITYWORKS
PHYSICAL THERAPY, P.C., JONGDUG PARK, D.C., YOUR
CHOICE CHIROPRACTIC, P.C., ALL ABOUT
CHIROPRACTIC, P.C., J PARK CHIROPRACTIC, P.C.,
HYEONGSOCK CHOI, L.Ac., CHOI ACUPUNCTURE, P.C.,
CHOICE ACUPUNCTURE, P.L.L.C., CHOI-GO
ACUPUNCTURE, P.L.L.C., MAHMOUD EZZ ELDEEN
SHALABY, PHYSICAL THERAPY OF NEW YORK, P.C.,
PETER KHAIM a/k/a/ PETER KHAIMOV, A&P HOLDING
GROUP CORP., ALEXANDER GULKAROV, LL
CONSULTING GROUP, INC. d/b/a BILLING 4 YOU, L.L.C.,

Docket No.: _____(      )

**Plaintiffs Demand a Trial
by Jury**

ROMAN ISRAILOV, ALL NETWORK MARKETING CORP.,
and JOHN DOE DEFENDANTS "1-10",

                                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## **NATURE OF THE ACTION**

1.      This action seeks to recover more than $5,900,000.00 that Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, tens of thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including initial and follow-up examinations, diagnostic testing, acupuncture services, chiropractic services, and physical therapy services (collectively, the "Fraudulent Services"), allegedly provided to New York automobile accident victims covered by policies of insurance issued by GEICO ("Insureds").

2.      The Fraudulent Services have been the product of a multi-pronged scheme perpetrated by Defendants against GEICO and other New York automobile insurers. First, unlicensed laypersons established two medical "clinics" and cultivated a patient base of Insureds that could be subjected to the Fraudulent Services. Second, the unlicensed laypersons "bought" the licenses of healthcare professionals in order to fraudulently control professional corporations and have them operate at the two medical "clinics." Third, the unlicensed laypersons used their illegal ownership of and control over the professional corporations and the patient base they cultivated to

implement a fraudulent, predetermined treatment and billing protocol in order to enrich themselves by exploiting the Insureds' no-fault insurance benefits.

3.  As part of Defendants' fraudulent scheme, Defendants billed GEICO and other New York automobile insurers for a laundry-list of high frequency and unnecessary treatments from a series of clinics, which were located at 105-10 Flatlands Avenue, Brooklyn, New York (the "Flatlands Avenue Medical Clinic") and 204-12 Hillside Avenue, Hollis, New York (the "Hillside Avenue Medical Clinic"). In order to implement the scheme, Defendants used Starrett City Medical, P.C. ("Starrett City Medical") and Hillcrest Medical Care, P.C. ("Hillcrest Medical"), as well as numerous acupuncture, chiropractic, and physical therapy professional corporations, including but not limited to Defendants Flatlands Chiropractic Wellness, P.C. ("Flatlands Chiropractic"), Kings Chiropractic Wellness, P.C. ("Kings Chiropractic"), Jeff Harmonize Acupuncture, P.C. ("Jeff Harmonize Acupuncture"), SJM Acupuncture, P.C. ("SJM Acupuncture"), LK Acupuncturist, P.C. ("LK Acupuncture"), PL Acupuncture, P.C. ("PL Acupuncture"), Handy Physical Therapy, P.C. ("Handy PT"), Cityworks Physical Therapy, P.C. ("Cityworks PT"), Your Choice Chiropractic, P.C. ("Your Choice Chiropractic"), All About Chiropractic, P.C. ("All About Chiropractic"), J Park Chiropractic, P.C. ("J Park Chiropractic"), Choi Acupuncture, P.C. ("Choi Acupuncture"), Choice Acupuncture, P.L.L.C. ("Choice Acupuncture"), Choi-Go Acupuncture, P.L.L.C. ("Choi-Go Acupuncture"), and Physical Therapy of New York, P.C. ("PT of NY") (collectively the "Provider Defendants") as vehicles to bill for the Fraudulent Services.

4.  GEICO brings this action to recover the monies wrongfully obtained from it by Defendants and further seeks a declaration that it is not legally obligated to pay reimbursement of

more than $7,000,000.00 in pending no-fault insurance claims that have been submitted by or on

behalf of the Provider Defendants, because:

> (i)    the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons and, therefore, were ineligible to bill for or to collect no-fault benefits;

> (ii)    the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols established and implemented solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

> (iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

> (iv)    the Provider Defendants unlawfully split fees with unlicensed individuals and/or engaged in illegal kickback and/or referral arrangements and, therefore, were ineligible to bill for or to collect no-fault benefits; and

> (v)    in many cases, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors.

5.    The Defendants fall into the following categories:

> (i)    Starrett City Medical, Flatlands Chiropractic, Kings Chiropractic, Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Handy PT, Cityworks PT, Hillcrest Medical, Your Choice Chiropractic, All About Chiropractic, J Park Chiropractic, Choi Acupuncture, Choice Acupuncture, Choi-Go Acupuncture and PT of NY are medical, chiropractic, acupuncture, and/or physical therapy professional corporations through which the Fraudulent Services purportedly were performed and billed to New York automobile insurance companies, including GEICO.

> (ii)    Azu Ajudua, M.D. ("Ajudua"), Leonard Luna, D.C. ("Luna"), Guo Chu Wu, L.Ac. ("Wu"), Stacy Juyoung Moon, L.Ac. ("Moon"), Lyudmila Krupnova, L.Ac. ("Krupnova"), Pascale Lawson, L.Ac. ("Lawson"), Mohamed Elsayed Khallaf ("Khallaf"), Irina Kataeva ("Kataeva"), Jongdug Park, D.C. ("Park"), Hyeongsock Choi, L.Ac. ("Choi") and Mahmoud Ezz Eldeen Shalaby ("Shalaby") (collectively, the "Nominal Owner Defendants"), are licensed medical, chiropractic, acupuncture and/or physical therapy professionals who falsely purported to own the Provider Defendants.

    (iii)    Defendants Peter Khaim a/k/a Peter Khaimov ("Khaimov"), A&P Holding Group Corp. ("A&P Holding"), Alexander Gulkarov ("Gulkarov"), LL Consulting Group, Inc. d/b/a Billing 4 You, LLC ("Billing 4 You"), Roman Israilov ("Israilov"), All Network Marketing Corp. ("All Network Marketing"), and John Doe Defendants Nos. "1-10" (collectively the "Management Defendants") (a) illegally owned and controlled the Provider Defendants, the Flatlands Avenue Medical Clinic, and the patient bases that were subjected to the Fraudulent Services, and (b) directed the Provider Defendants' illegal kickback scheme for patient referrals and predetermined treatment and billing protocols that were imposed without regard for genuine patient care.

6.    The Provider Defendants, though nominally owned on paper by the Nominal Owner Defendants, have been at all times secretly owned, operated, and controlled by the Management Defendants, and have served as vehicles through which fraudulent no-fault claims have been and continue to be submitted to GEICO and other New York automobile insurers.

7.    As discussed below, Defendants at all relevant times have known that: (i) the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons and, therefore, were ineligible to bill for or to collect no-fault benefits; (ii) the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols established and implemented solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) the Provider Defendants unlawfully split fees with unlicensed individuals and/or engaged in illegal kickback and referral arrangements and, therefore, were ineligible to bill for or to collect no-fault benefits; and (v) in many cases, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors.

8.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

9.     The charts annexed hereto as Exhibits "1-17" set forth the fraudulent claims that have been identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

10.    Defendants' fraudulent scheme perpetrated against GEICO and other New York automobile insurers began as early as 2015 and continues uninterrupted through present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $5,900,000.00.

## THE PARTIES

**I.     Plaintiffs**

11.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in New York.

**II.    Defendants**

**A.     The Provider Defendants and Nominal Owner Defendants**

12.    Defendant Starrett City Medical is a New York medical professional corporation with its principal place of business in New York. Starrett City Medical was incorporated on July 21, 2015 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

13.    Defendant Hillcrest Medical is a New York medical professional corporation with its principal place of business in New York. Hillcrest Medical was incorporated on December 14, 2015 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

14.     Defendant Ajudua resides in and is a citizen of New York State. Ajudua was licensed to practice medicine in New York on April 22, 1977. From 2015 to present, Ajudua has served as the nominal or "paper" owner of Starrett City Medical and Hillcrest Medical and has purported to perform many of the Fraudulent Services on behalf of the professional corporations.

15.     Ajudua has a long history of committing insurance fraud.

16.     In fact, Ajudua was sued on multiple occasions, alleging that he engaged in illegal kickback arrangements, performed medically unnecessary healthcare services pursuant to a pre-determined fraudulent protocol, and/or illegally allowed unlicensed individuals to own and control professional corporations owned by him. See e.g. Government Employees Insurance Company, et al. v. 21st Century Pharmacy, Inc., et al., 1:16-cv-04826 (ERK)(JO); Government Employees Insurance Company, et al. v. Ajudua, M.D., et al., 1:15-cv-05199 (MKB)(RLM); Government Employees Insurance Company, et al. v. Jacobsen, D.C., et al., 1:15-cv-07236(ERK)(RML).

17.     What is more, on or about May 17, 2018, in the Supreme Court of the State of New York, New York County, Ajudua pleaded guilty to various insurance fraud-related crimes involving the submission of fraudulent billing to the New York Medicaid program.

18.     As a result of Ajudua's guilty plea, on or about June 26, 2018, the New York State Bureau of Professional Medical Conduct (the "BPMC") charged Ajudua with committing professional misconduct as defined by N.Y. Education Law § 6530(9)(a)(i). In response to the BPMC's charge, Ajudua surrendered his New York State medical license, effective July 23, 2019.

19.     Defendant Flatlands Chiropractic is a New York professional corporation with its principal place of business in New York. Flatlands Chiropractic was incorporated on February 29, 2016 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

20.     Defendant Kings Chiropractic is a New York professional corporation with its principal place of business in New York. Kings Chiropractic was incorporated on July 13, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

21.     Defendant Luna resides in and is a citizen of New York State. Luna was licensed to practice chiropractic medicine in New York on September 5, 2006. Luna has served as the nominal or "paper" owner of: (i) Flatlands Chiro, from 2016 to present and (ii) Kings Chiro, from 2017 to present. Luna has purported to perform many of the Fraudulent Services on behalf of the professional corporations.

22.     Defendant Jeff Harmonize Acupuncture is a New York professional corporation with its principle place of business in New York. Jeff Harmonize Acupuncture was incorporated on August 5, 2014 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

23.     Defendant Wu resides in and is a citizen of New York State. Wu was licensed to practice acupuncture in New York on May 23, 2013. Wu has served as the nominal or "paper" owner of Jeff Harmonize Acupuncture and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

24.     Defendant SJM Acupuncture is a New York professional corporation with its principle place of business in New York. SJM Acupuncture was incorporated on March 16, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

25.     Defendant Moon resides in and is a citizen of New York State. Moon was licensed to practice acupuncture in New York on February 18, 2014. From 2017 to present, Moon has served as the nominal or "paper" owner of SJM Acupuncture and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

26.     Defendant LK Acupuncture is a New York professional corporation with its principle place of business in New York. LK Acupuncture was incorporated on February 5, 2019 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

27.     Defendant Krupnova resides in and is a citizen of New York State. Krupnova was licensed to practice acupuncture in New York on September 16, 2010. From 2019 to present, Krupnova has served as the nominal or "paper" owner of LK Acupuncture and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

28.     Defendant PL Acupuncture is a New York professional corporation with its principle place of business in New York. PL Acupuncture was incorporated on April 19, 2019 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

29.     Defendant Lawson resides in and is a citizen of New York State. Lawson was licensed to practice acupuncture in New York on September 12, 2004. From 2019 to present, Lawson has served as the nominal or "paper" owner of PL Acupuncture, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

30.     Defendant Handy PT is a New York professional corporation with its principle place of business in New York. Handy PT was incorporated on September 13, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

31.     Defendant Khallaf resides in and is a citizen of New York State. Khallaf was licensed to practice physical therapy in New York on August 28, 2013. From 2017 to present, Khallaf has served as the nominal or "paper" owner of Handy PT and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

32.     Defendant Cityworks PT is a New York professional corporation with its principle place of business in New York. Cityworks PT was incorporated on March 13, 2019 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

33.     Defendant Kataeva resides in and is a citizen of New York State. Kataeva was licensed to practice physical therapy in New York on August 14, 2015. From 2019 to present, Kataeva has served as the nominal or "paper" owner of Cityworks PT and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

34.     Defendant Your Choice Chiropractic is a New York professional corporation with its principle place of business in New York. Your Choice Chiropractic was incorporated on January 4, 2016 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

35.     Defendant All About Chiropractic is a New York professional corporation with its principle place of business in New York. All About Chiropractic was incorporated on September 14, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

36.     Defendant J Park Chiropractic is a New York professional corporation with its principle place of business in New York. J Park Chiropractic was incorporated on June 11, 2019 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

37.     Defendant Park resides in and is a citizen of New York State. Park was licensed to practice chiropractic medicine in New York on February 21, 2012. Park has served as the nominal or "paper" owner of: (i) Your Choice Chiropractic, from 2016 to present; (ii) All About Chiropractic, from 2017 to present; and (iii) J Park Chiropractic, from 2019 to present. Park has purported to perform many of the Fraudulent Services on behalf of the professional corporations.

38.     Defendant Choi Acupuncture is a New York professional corporation with its principle place of business in New York. Choi Acupuncture was incorporated on June 27, 2016 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

39.     Defendant Choice Acupuncture is a New York professional limited liability company with its principle place of business in New York. Choice Acupuncture was formed on February 21, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

40.     Defendant Choi-Go Acupuncture is a New York professional limited liability company with its principle place of business in New York. Choice Acupuncture was formed on August 14, 2019 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

41.     Defendant Choi resides in and is a citizen of New Jersey. Choi was licensed to practice acupuncture in New York on May 14, 2014. Choi has served as the nominal or "paper" owner of: (i) Choi Acupuncture, from 2016 to present; (ii) Choice Acupuncture, from 2017 to present; and (iii) Choi-Go Acupuncture, from 2019 to present. Choi has purported to perform many of the Fraudulent Services on behalf of the professional corporations.

42.     Defendant PT of NY is a New York professional corporation with its principle place of business in New York. PT of NY was incorporated on November 30, 2017 and was used by Defendants as a vehicle to submit fraudulent billing to GEICO.

43.     Defendant Shalaby resides in and is a citizen of New York State. Shalaby was licensed to practice physical therapy in New York on February 17, 2015. From 2017 to present, Shalaby has served as the nominal or "paper" owner of PT of NY, and has purported to perform many of the Fraudulent Services on behalf of the professional corporation.

**B.** **The Management Defendants**

44.     Defendant Billing 4 You was incorporated in New York State on or about January 2, 2013, has its principal place of business in New York, and has been used by Gulkarov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

45.     Defendant Gulkarov resides in and is a citizen of New York State. Gulkarov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

46.     Defendant All Network Marketing was incorporated in New York State on or about May 12, 2016, has its principal place of business in New York, and has been used by Israilov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

47.     Defendant Israilov resides in and is a citizen of New York State. Israilov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatments provided to Insureds at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

48.     Defendant A&P Holding was incorporated in New York State on or about December 1, 2014, has its principal place of business in New York, and has been used by Khaimov and the other Management Defendants to illegally own and control the Provider Defendants and to siphon revenues from the Provider Defendants to the Management Defendants.

49.     Defendant Khaimov resides in and is a citizen of New York State. Khaimov is a non-physician who at all times has secretly and unlawfully owned the Provider Defendants, along with the other Management Defendants, by virtue of the control he exercised over the Provider Defendants' operations and profits, as well as the treatment provided to Insureds at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

50.     Khaimov has a history of involvement in health care fraud schemes.

51.     For example, on December 18, 2020, Khaimov was indicted in the United States District Court for the Eastern District of New York on charges that he – together with his younger brother – knowingly and intentionally conspired to defraud the federal health care benefit programs and launder the proceeds of the scheme through fraudulent pass-through entities.

52.     According to the criminal complaint, Khaimov, along with others, capitalized on relaxed pharmaceutical regulations, which were designed to ensure that beneficiaries received access to needed medications during the Covid-19 public health emergency, by submitting massive amounts of claims for expensive prescriptions that were never actually dispensed.

53.     In addition, Gulkarov, Khaimov, Israilov, Billing 4 You, A&P Holding, and All Network Marketing were all previously sued by GEICO based on similar claims as those alleged in this Complaint. Specifically, in Government Employees Insurance Company, et al. v. Chumaciero, M.D., et al., 1:20-cv-02220 (E.D.N.Y. 2020)(EK)(PK), Gulkarov, Khaimov, Israilov, Billing 4 You, A&P Holding, and All Network Marketing were alleged to have illegally owned and controlled several professional corporations that purportedly provided medically unnecessary services to GEICO Insureds out of two no-fault clinics located in the New York metropolitan area.

54.     What is more, Khaimov and A&P Holding were previously sued by State Farm for committing insurance fraud. See State Farm Mutual Automobile Insurance Company v. 21st Century Pharmacy, Inc., et al., 1:17-cv-05845 (E.D.N.Y. 2017) (MKB)(VMS).

55.     Upon information and belief, John Doe Defendants "1 – 10" reside in and are citizens of New York State. John Doe Defendants "1 – 10" are individuals and entities, presently not identifiable, who are not and never have been licensed medical professionals, yet – together with the Management Defendants – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law, and have derived economic benefits from the operation of the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

56.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

57.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

58.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

59.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

60.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

61.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

62.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

63.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

64.     Pursuant to the No-Fault Laws, healthcare providers are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

65.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

66.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

67.     New York law prohibits licensed healthcare providers from splitting fees, paying or accepting kickbacks, or profiting in exchange for patient referrals or the furnishing of professional services. See, e.g., New York Education Law §§ 6509-a; 6531.

68.     Pursuant to Education Law §6512, §6530 (11), and (18), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

69.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee. In addition, pursuant to 8

N.Y.C.R.R. §29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

70.     Pursuant to Education Law §6530(19), a licensee commits professional misconduct where he/she permits a non-licensed person to share in fees for professional services.

71.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is unlawfully incorporated, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

72.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

73.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law … .

74.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u>

provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

75.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

76.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

77.     Pursuant to New York State Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

78.     Beginning in or about 2015, Defendants masterminded and implemented a series of interrelated, complex fraudulent schemes pursuant to which the Provider Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in No-Fault Benefits they were never entitled to receive.

**A.     The Fraudulent Ownership and Operation of the Provider Defendants**

79.     At all relevant times herein, the Management Defendants controlled the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic and unlawfully owned and controlled the healthcare providers operating within the two clinics.

80.     Although the Nominal Owner Defendants are listed as the record owners of the Provider Defendants on the Certificates of Incorporation, the Nominal Owner Defendants abdicated control over the billing protocols, treatment protocols, and the profits that were generated through the Provider Defendants. In fact, the day-to-day operations, supervisory control, and true ownership of the Provider Defendants rested in the hands of the Management Defendants.

81.     The Nominal Owner Defendants never sought to establish or build their name recognition or the name recognition of the Provider Defendants under which they operated in order to draw in business and never made any legitimate effort to generate patients. The reason for this is simple, the Management Defendants, rather than the Nominal Owner Defendants, created and have always controlled the patient bases at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

82.     The Nominal Owner Defendants had no genuine doctor-patient relationship with the Insureds that visited the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, as the patients were simply directed to subject themselves to treatment by whatever healthcare providers were on duty that day, regardless of the actual healthcare needs of the patients themselves.

83.     In fact, once patients arrived at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic for treatment, the healthcare services that each patient received from the Provider Defendants was pre-determined. These predetermined treatment protocols were

established by the Management Defendants and implemented by the Nominal Defendants in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual healthcare needs of each individual Insured.

84.     Throughout the course of the Nominal Owner Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants.

85.     The Management Defendants' decision-making authority relating to the operation and management of the Provider Defendants included control over the treatment protocols, the hiring of individuals who allegedly performed the Fraudulent Services, the hiring of administrative employees, the control over how the services would be billed to insurers, including GEICO, and how the profits of the Provider Defendants were to be dispersed.

86.     In reality, the Nominal Owner Defendants were never anything more than de facto employees of the Management Defendants.

87.     To conceal their illegal financial relationships and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have Gulkarov purport to act as "practice administrator" of the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

88.     As part of the Management Defendants' control over the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, the Management Defendants had the Provider Defendants utilize Billing 4 You for "billing" services. Billing 4 You typically received $5,000 per Provider Defendant per month for performing purported "billing" services.

89.     Furthermore, the Management Defendants had the Provider Defendants utilize All Network Marketing for "marketing" services. All Network Marketing typically received $5,000 per Provider Defendant per month for purported "marketing" services.

90.     In addition, Ajudua and Starrett City Medical paid "rent" to Defendant A&P Holding.

91.     A&P Holding, Billing 4 You, and All Network Marketing all operated from 62-43A Woodhaven Boulevard, Rego Park, New York. A&P Holding held the main lease at this location. In addition, many of the Nominal Owner Defendants routinely visited this location in order to meet with the Management Defendants.

92.     The Management Defendants, not the Nominal Owner Defendants, controlled the receipt of all insurance proceeds collected by the Provider Defendants. Although the Nominal Owner Defendants received insurance checks from GEICO, the Nominal Owner Defendants – without reviewing the checks, making an inventory of them, or determining how much was received – turned these checks over to the Management Defendants. In turn, the Management Defendants utilized a scanner to deposit the checks directly into bank accounts held nominally in the names of the Provider Defendants, thereby giving the Management Defendants access and control over their accounts. Billing 4 You provided a monthly boilerplate "invoice" to the Provider Defendants indicating only the $5,000 due for their "services." Billing 4 You did not identify how much was deposited, an inventory of checks, or any other information indicating how much Billing 4 You allegedly deposited into the Provider Defendants' accounts each month.

93.     The Management Defendants dictated all the financial arrangements with the Provider Defendants and concealed them through individual "sham" agreements and invoices with each of the Provider Defendants.

94.     The individual agreements and financial arrangements with the Provider Defendants were not reflective of fair market value or the actual value of the services provided, if any, and when totaled among all of the Provider Defendants, reflected a scheme to use each of the Provider Defendants as a vehicle to illegally profit, unlawfully split fees, and funnel large sums of money to Management Defendants in contravention of New York law.

1.      **The Fraudulent Ownership and Operation of Starrett City Medical**

95.     As an initial step in their fraudulent scheme, the Management Defendants commenced a search for a licensed medical professional who would be willing to sell the use of his or her medical license to the Management Defendants so that the Management Defendants could illegally operate and control a medical professional corporation for the purpose of submitting fraudulent no-fault billing to New York no-fault insurers.

96.     The Management Defendants first recruited Ajudua, who was willing to sell the use of his medical license to the Management Defendants, so that they could illegally own, operate, and submit fraudulent no-fault billing through Starrett City Medical.

97.     Although Ajudua is listed as the owner of record of Starrett City Medical on its certificate of incorporation, Ajudua exercised no ownership or control over the profits generated from Starrett City Medical. Rather, the day-to-day operations, supervisory control, and true ownership of Starrett City Medical rested in the hands of the Management Defendants.

98.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Starrett City Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Ajudua.

99.     In exchange for a designated salary or other form of compensation from the Management Defendants, Ajudua agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Starrett City Medical and that he truly owned, controlled, and practiced through the professional corporation.

100.    Ajudua agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Starrett City Medical and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

101.    Once Starrett City Medical was fraudulently incorporated on July 21, 2015, Ajudua ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

102.    The Management Defendants – rather than Ajudua – provided all start-up costs and investment in Starrett City Medical. In addition, Ajudua did not incur any costs to establish the Starrett City Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

103.    On July 16, 2015, approximately 5 days before Starrett City Medical even was incorporated, the Management Defendants caused Ajudua to treat Insureds at the Flatlands Avenue Medical Clinic – a location that the Management Defendants controlled – and submit bills for those services to GEICO through Starrett City Medical.

104.    Ajudua never was the true shareholder, director, or officer of Starrett City Medical, and never had any true ownership interest in or control over the professional corporation.

105.    True ownership and control over Starrett City Medical always rested entirely with the Management Defendants, who used the facade of Starrett City Medical to do indirectly what they

were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

106.    Ajudua exercised absolutely no control over or ownership interest in Starrett City Medical.

107.    All decision-making authority relating to the operation and management of Starrett City Medical was vested entirely with the Management Defendants.

108.    In addition, Ajudua never controlled or maintained any of Starrett City Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Starrett City Medical's financial affairs; never hired or supervised any of Starrett City Medical's employees or independent contractors; and was completely unaware of fundamental aspects of how Starrett City Medical operated.

109.    Although Ajudua purported to be the sole owner of Starrett City Medical, he worked at the Flatland Avenue Medical Clinic only two days per week and had no genuine involvement in managing the purported "practice" operating at that location.

110.    By contrast, the extent to which the Management Defendants managed and controlled Starrett City Medical allowed them to maintain total control over Starrett City Medical, the accounts receivable, and any revenues that were generated therefrom, all while concealing their illegal ownership and control of the PC.

111.    Specifically, and in keeping with the fact that the Management Defendants managed and controlled Starrett City Medical, Ajudua testified that:

   (i)    The Starrett City Medical Clinic was a "turnkey" operation when he arrived;

   (ii)   Gulkarov was paid $85,000 as "practice administrator" for the Flatlands Avenue Medical Clinic and $85,000 as the "practice administrator" for the Hillside Avenue Medical Clinic;

(iii)    Gulkarov hired all administrative staff;

(iv)    Ajudua did not review the bills before they were sent to insurance carriers;

(v)     Gulkarov had access to a signature stamp of Ajudua's name;

(vi)    Ajudua paid $5,000 per month to Israilov (a former "administrator" for Ajudua) for "marketing" services, which consisted of making "contact with lawyers in the area"; and

(vii)   Ajudua paid $13,000 per month to Khaimov and A&P Holding for purported "rent" at the Flatlands Avenue Medical Clinic.

112.    As indicated, Ajudua did not exercise control of the bills and treatment reports submitted under his name at Starrett City Medical.

113.    The Management Defendants, while concealing their illegal ownership and control of Starrett City Medical, were responsible for hiring and firing personnel, endorsed and deposited checks received from insurance companies on behalf of Starrett City Medical, and had access to Starrett City Medical's bank account.

114.    What is more, the Management Defendants controlled the leasing and financial arrangements with the Provider Defendants at the Flatlands Avenue Medical Clinic.

115.    The extent to which the Management Defendants managed Starrett City Medical allowed them to maintain total control over Starrett City Medical, the accounts receivable, and any revenues that were generated therefrom.

116.    Starrett City Medical was used as a vehicle by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

117.    Though ostensibly organized to provide a range of health care services to Insureds at a single location, the Flatlands Avenue Medical Clinic was actually organized to be a convenient, one-stop shop for no-fault insurance fraud.

118.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as Starrett City Medical's operations were subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

**2.      The Fraudulent Ownership and Operation of Hillcrest Medical**

119.    As a further step in their fraudulent scheme, the Management Defendants sought to establish an additional clinic and continue illegally operating and controlling additional professional corporations for the purpose of submitting additional fraudulent no-fault billing to New York no-fault insurers.

120.    The Management Defendants caused Ajudua, who had already sold the use of his medical license to the Management Defendants, to incorporate Hillcrest Medical on or about December 14, 2015.

121.    Although Ajudua is listed as the owner of record of Hillcrest Medical on the certificate of incorporation, Ajudua exercised no ownership or control over the profits generated from Hillcrest Medical. Rather, the day-to-day operations, supervisory control, and true ownership of Hillcrest Medical rested in the hands of the Management Defendants.

122.    In order to circumvent New York law and to induce the Education Department to issue a certificate of authority authorizing Hillcrest Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Ajudua.

123.    As with Starrett City Medical, in exchange for a designated salary or other form of compensation from the Management Defendants, Ajudua agreed to falsely represent in the certificate of incorporation and related filings with New York State, that he was the true shareholder, director, and officer of Hillcrest Medical and that he truly owned, controlled, and practiced through the professional corporation.

124.    Similar to Starrett City Medical, Ajudua agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, and officer of Hillcrest Medical and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

125.    Once Hillcrest Medical was fraudulently incorporated on December 14, 2015, Ajudua ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

126.    The Management Defendants – rather than Ajudua – provided all start-up costs and investment in Hillcrest Medical. In addition, Ajudua did not incur any costs to establish the Hillcrest Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

127.    On or about June 1, 2016, the Management Defendants caused Hillcrest Medical to commence operations at the Hillside Avenue Medical Clinic – a location that the Management Defendants controlled – alongside other professional corporations they managed and/or controlled or would come to manage and/or control.

128.    Ajudua never was the true shareholder, director, or officer of Hillcrest Medical, and never had any true ownership interest in or control over the professional corporation.

129.    True ownership and control over Hillcrest Medical always rested entirely with the Management Defendants, who used the facade of Hillcrest Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

130.    Similar to Starrett City Medical, Ajudua exercised absolutely no control over or ownership interest in Hillcrest Medical.

131. All decision-making authority relating to the operation and management of Hillcrest Medical was vested entirely with the Management Defendants.

132. In addition, Ajudua never controlled or maintained any of Hillcrest Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Hillcrest Medical's financial affairs; never hired or supervised any of Hillcrest Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Hillcrest Medical operated.

133. Although Ajudua purported to be the sole owner of Hillcrest Medical, he typically worked at the Hillcrest Medical Clinic only 2-3 days per week and had no genuine involvement in managing the purported "practice" operating at that location.

134. By contrast, the extent to which the Management Defendants managed and controlled Hillcrest Medical allowed them to maintain total control over Hillcrest Medical, the accounts receivable, and any revenues that were generated therefrom, all while concealing their illegal ownership and control of the PC.

135. Hillcrest Medical was used as a vehicle by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

136. Though ostensibly organized to provide a range of health care services to Insureds at a single location, the Hillside Avenue Medical Clinic was actually organized to be a convenient, one-stop shop for no-fault insurance fraud.

137. The Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as Hillcrest Medical's operations were subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

3.      **The Fraudulent Ownership and Operation of the Chiropractic Professional Corporations**

138.     The Management Defendants expanded their fraudulent scheme by recruiting licensed chiropractic professionals who were willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control chiropractic professional corporations under the chiropractic professionals' names at both the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

139.     Beginning in 2016, the Management Defendants recruited Luna and Park, both licensed chiropractors who were willing to sell to the Management Defendants the use of their professional licenses so that they could fraudulently incorporate and/or control Flatlands Chiropractic and Your Choice Chiropractic. The Management Defendants then used Flatlands Chiropractic and Your Choice Chiropractic to submit billing to GEICO for the Fraudulent Services that were purportedly performed at the two locations.

140.     Although Luna and Park are listed as the owners of record of Flatlands Chiropractic and Your Choice Chiropractic, respectively, on the certificates of incorporation, Luna and Park exercised no control over the profits that were generated from the operation of Flatlands Chiropractic and Your Choice Chiropractic. Rather, the day-to-day operations, supervisory control, and true ownership of Flatlands Chiropractic and Your Choice Chiropractic rested in the hands of the Management Defendants.

141.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Luna and Park, wherein, in exchange for a designated salary or other form of compensation, Luna and Park each agreed to falsely represent that they were the true shareholders,

directors, and officers of the chiropractic professional corporations and that they truly owned, controlled, and practiced through the chiropractic professional corporations.

142.    Luna and Park each agreed to falsely represent that they were the true shareholders, directors, and officers of the chiropractic professional corporations and that they truly owned, controlled, and practiced through the chiropractic professional corporations knowing that the professional corporations were going to be used to submit fraudulent billing to insurers.

143.    The Management Defendants – rather than Luna and Park – provided all costs associated with establishing the chiropractic professional corporations at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, and all investment in the chiropractic professional corporations subsequent to the purchase of Luna and Park's chiropractic licenses by the Management Defendants.

144.    Luna and Park did not incur any costs to establish the chiropractic professional corporations' practices at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, nor did they invest any money in the chiropractic professional corporations they purportedly owned subsequent to the purchase of their chiropractic licenses by the Management Defendants.

145.    The Management Defendants caused Luna and Park to commence operations at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, respectively, alongside the other professional corporations that the Management Defendants controlled.

146.    Luna and Park never were the true shareholders, directors, or officers of Flatlands Chiropractic and Your Choice Chiropractic, respectively, and never had any true ownership interest in or control over the professional corporations.

147.    True ownership and control over Flatlands Chiropractic and Your Choice Chiropractic always rested entirely with the Management Defendants, who used the facade of the

chiropractic professional corporations to do indirectly what they were forbidden from doing directly, namely: (i) employ chiropractic professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

148.     Luna and Park exercised absolutely no control over or ownership interest in Flatlands Chiropractic or Your Choice Chiropractic, respectively.

149.     All decision-making authority relating to the operation and management of Flatlands Chiropractic and Your Choice Chiropractic was vested entirely with the Management Defendants.

150.     In addition, Luna and Park never controlled or maintained any of Flatlands Chiropractic or Your Choice Chiropractic's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; and never hired or supervised any of their employees or independent contractors.

151.     Specifically, and in keeping with the fact that the Management Defendants managed and controlled Flatlands Chiropractic: (i)  Flatlands Chiropractic paid Billing 4 You $5,000.00 per month to do its "billing"; (ii) Billing 4 You had unfettered authority to use Luna's electronic signature; and (iii) Billing 4 You had access to Flatlands Chiropractic bank accounts and electronically deposited insurance checks through a scanner at Billing 4 You.

152.     In addition, and also in keeping with the fact that the Management Defendants managed and controlled Flatlands Chiropractic, Flatlands Chiropractic paid All Network Marketing $3,500.00 per month for "marketing" services, which in 2017, consisted of having Luna attend two networking meetings and two parties.

153.     Specifically, and in keeping with the fact that the Management Defendants managed and controlled Your Choice Chiropractic: (i) Your Choice Chiropractic paid Billing 4 You

$5,000.00 per month to do its "billing"; (ii) Billing 4 You had access to Your Choice Chiropractic's bank account in that they electronically deposited insurance checks through a scanner at Billing 4 You and had the password to sign into Your Choice Chiropractic's account; and (iii) Billing 4 You hired the collection lawyers for Your Choice Chiropractic.

154.    In addition, and also in keeping with the fact that the Management Defendants managed and controlled Your Choice Chiropractic, Your Choice Chiropractic paid All Network Marketing $3,500.00 per month for "marketing" services, which consisted of one or two meetings per month with personal injury lawyers.

155.    What is more, and also in keeping with the fact that the Management Defendants managed and controlled Your Choice Chiropractic, Park was typically only present at the Hillside Avenue Medical Clinic three days per week and routinely travelled to the 62-43A Woodhaven Blvd., Rego Park location to meet with Gulkarov and Israilov.

156.    Furthermore, to continue their fraudulent scheme, the Management Defendants again used Luna and Park's chiropractor licenses so that they could fraudulently incorporate and/or control Kings Chiropractic, All About Chiropractic, and J Park Chiropractic. The Management Defendants then used Kings Chiropractic, All About Chiropractic, and J Park Chiropractic to submit billing to GEICO for the Fraudulent Services that were purportedly performed at the two locations.

157.    Specifically, in or around November 2017, in an effort to further conceal their fraudulent scheme from New York insurance companies, including GEICO, the Management Defendants started using Kings Chiropractic, which is purportedly owned by Luna, at the Flatlands Avenue Medical Clinic and All About Chiropractic, which is purportedly owned by Park, at the Hillside Avenue Medical Clinic.

158.    Then, in or around September 2019, in an additional effort to conceal their fraudulent scheme from New York insurance companies, including GEICO, the Management Defendants started using a third chiropractic professional corporation at the Hillside Avenue Medical Clinic – J Park Chiropractic, also purportedly owned by Park.

159.    Accordingly, the Management Defendants caused the following Defendants to be established at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic during the following years:

|      | **Flatlands Avenue Medical Clinic** | **Hillside Avenue Medical Clinic** |
|------|-------------------------------------|------------------------------------|
| 2016 | Flatlands Chiropractic (Luna)       | Your Choice Chiropractic (Park)    |
| 2017 | Flatlands Chiropractic (Luna)       | Your Choice Chiropractic (Park)    |
| 2018 | Kings Chiropractic (Luna)           | All About Chiropractic (Park)      |
| 2019 | Kings Chiropractic (Luna)           | All About Chiropractic (Park)/J Park Chiropractic (Park) |

160.    Although Luna is listed on the certificate of incorporation as the owner of record of Kings Chiropractic and Park is listed on the certificates of incorporation as the owner of both All About Chiropractic and J Park Chiropractic, as with Flatlands Chiro and Your Choice Chiropractic, Luna and Park exercised no control over the profits that were generated from the operation of Kings Chiropractic, All About Chiropractic, and J Park Chiropractic. Rather, the day-to-day operations, supervisory control, and true ownership of Kings Chiropractic, All About Chiropractic, and J Park Chiropractic rested in the hands of the Management Defendants.

161.    Luna and Park never were the true shareholders, directors, or officers of Kings Chiropractic and All About Chiropractic and J Park Chiropractic, respectively, and never had any true ownership interest in or control over the professional corporations.

162.    True ownership and control over Kings Chiropractic, All About Chiropractic, and J Park Chiropractic always rested entirely with the Management Defendants, who used the facade of the chiropractic professional corporations to do indirectly what they were forbidden from doing directly, namely: (i) employ chiropractic professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

163.    Luna and Park exercised absolutely no control over or ownership interest in Kings Chiropractic and All About Chiropractic and J Park Chiropractic, respectively.

164.    All decision-making authority relating to the operation and management of Kings Chiropractic, All About Chiropractic, and J Park Chiropractic was vested entirely with the Management Defendants.

165.    In addition, Luna and Park never controlled or maintained any of Kings Chiropractic, All About Chiropractic, or J Park Chiropractic's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; and never hired or supervised any of their employees or independent contractors.

166.    Specifically, and in keeping with the fact that the Management Defendants managed and controlled All About Chiropractic, All About Chiropractic paid All Network Marketing $3,500.00 a month for "networking" services. Park worked with Israilov at All Network Marketing and travelled on multiple occasions to All Network's office located on Woodhaven Boulevard in Queens.

167.    In addition, and also in keeping with the fact that the Management Defendants managed and controlled All About Chiropractic, All About Chiropractic paid Billing 4 You $5,000.00 a month for billing services. Billing 4 You had access to Park's signature stamp, as well as access to All About Chiropractic's bank account in that they electronically deposited insurance checks through a scanner at Billing 4 You and had the password to sign into All About Chiropractic's account.

168.    Inexplicably, Billing 4 You retained unfettered and complete access to All About Chiropractic's bank accounts, despite Park firing them in March 2019. At that time, Park replaced Billing 4 You with a new billing company called, RMA Billing. Upon information and belief, RMA Billing is owned by Gulkarov's wife.

169.    In addition, and also in keeping with the fact that the Management Defendants, and not Park, managed and controlled All About Chiropractic, Park had no knowledge as to All About Chiropractic's gross revenue for 2018 or how much All About Chiropractic billed GEICO in 2018 or 2019. In addition, Park did not review bills that were submitted to GEICO by RMA Billing.

170.    The chiropractic professional corporations were essentially "plug and play entities" that were used as vehicles by the Management Defendants to unlawfully split-fees and funnel large sums of money to themselves in contravention of New York law.

171.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the operations of the professional chiropractor corporations were subject to the pecuniary interests of non-chiropractors as opposed to the independent medical judgment of true chiropractor-owners.

4.      **The Fraudulent Ownership and Operation of the Acupuncture Professional Corporations**

172.     The Management Defendants fraudulent scheme also involved the recruitment of licensed acupuncturists who were willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control a series of acupuncture professional corporations under the acupuncture professionals' names.

173.     Beginning in 2015, the Management Defendants recruited Wu, Moon, Krupnova, Lawson, and Choi, all licensed acupuncture professionals who were willing to sell to the Management Defendants the use of their professional licenses so that they could fraudulently incorporate and/or control Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, and Choi Acupuncture.

174.     Specifically, in 2015 the Management Defendants recruited Wu, a licensed acupuncturist who was willing to sell them the use of his acupuncture license so that they could fraudulently incorporate Jeff Harmonize Acupuncture and thereafter cause Jeff Harmonize Acupuncture to operate at the Flatlands Avenue Medical Clinic. The Management Defendants used Jeff Harmonize Acupuncture to submit billing for the Fraudulent Services to GEICO.

175.     In 2016, the Management Defendants recruited Choi, a licensed acupuncturist who was willing to sell them the use of his acupuncture license so that they could fraudulently incorporate Choi Acupuncture and thereafter cause Choi Acupuncture to operate at the Hillside Avenue Medical Clinic. The Management Defendants used Choi Acupuncture to submit billing for the Fraudulent Services to GEICO.

176.     In 2017, in an effort to further conceal their fraudulent scheme from New York insurance companies, including GEICO, the Management Defendants and Choi fraudulently

incorporated a new acupuncture professional corporation, Choice Acupuncture, and the Management Defendants thereafter caused Choice Acupuncture to operate at the Hillside Avenue Medical Clinic. The Management Defendants used Choice Acupuncture to submit billing for the Fraudulent Services to GEICO.

177. Also, in 2017, the Management Defendants recruited Moon, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate SJM Acupuncture and thereafter cause SJM Acupuncture to operate at the Flatlands Avenue Medical Clinic. The Management Defendants used SJM Acupuncture to submit billing for the Fraudulent Services to GEICO.

178. In 2019, in an additional effort to conceal their fraudulent scheme from New York insurance companies, including GEICO, the Management Defendants and Choi fraudulently incorporated another new acupuncture professional corporation, Choi-Go Acupuncture. The Management Defendants thereafter caused Choi-Go Acupuncture to operate at the Hillside Avenue Medical Clinic. The Management Defendants used Choi-Go Acupuncture to submit billing for the Fraudulent Services to GEICO.

179. Also, in 2019, the Management Defendants recruited Krupnova, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate LK Acupuncture and thereafter cause LK Acupuncture to operate at the Flatlands Avenue Medical Clinic. The Management Defendants used LK Acupuncture to submit billing for the Fraudulent Services to GEICO.

180. The Management Defendants also recruited Lawson, a licensed acupuncturist who was willing to sell them the use of his acupuncture license so that they could fraudulently incorporate PL Acupuncture in 2019 and thereafter cause PL Acupuncture to operate at the Flatlands Avenue

Medical Clinic. The Management Defendants used PL Acupuncture to submit billing for the Fraudulent Services to GEICO.

181.    Accordingly, the Management Defendants caused the following Defendants to be established at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic during the following years:

|  | Flatlands Avenue Medical Clinic | Hillside Avenue Medical Clinic |
|---|---|---|
| 2015 | Jeff Harmonize Acupuncture (Wu) | |
| 2016 | Jeff Harmonize Acupuncture (Wu) | Choi Acupuncture (Choi) |
| 2017 | SJM Acupuncture (Moon) | Choice Acupuncture (Choi) |
| 2018 | SJM Acupuncture (Moon) | Choice Acupuncture (Choi) |
| 2019 | LK Acupuncture (Krupnova) | Choi-Go Acupuncture (Choi) |
| 2020 | PL Acupuncture (Lawson) | Choi-Go Acupuncture (Choi) |

182.    Although Wu, Moon, Krupnova, and Lawson are listed as the "owners" of record on the certificates of incorporation of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, and PL Acupuncture, respectively, and Choi is listed as the "owner" of record on the certificates of incorporation of Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture, Wu, Moon, Krupnova, Lawson and Choi exercised no ownership or control over the profits that were generated from the operation of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture. Rather, the day-to-day operations, supervisory control, and true ownership of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi

Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture rested in the hands of the Management Defendants.

183.    In order to circumvent New York law preventing non-medical professionals from owning and controlling acupuncture professional corporations, the Management Defendants entered into a secret scheme with Wu, Moon, Krupnova, Lawson and Choi, wherein, in exchange for a designated salary or other form of compensation, Wu, Moon, Krupnova, Lawson and Choi each agreed to falsely represent that they were the true shareholders, directors, and officers of the acupuncture professional corporations and that they truly owned, controlled, and practiced through Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture.

184.    Wu, Moon, Krupnova, Lawson and Choi each agreed to falsely represent that they were the true shareholders, directors, and officers of the acupuncture professional corporations and that they truly owned, controlled, and practiced through the acupuncture professional corporations, knowing that the professional corporations were going to be used to submit fraudulent billing to insurers.

185.    The Management Defendants – rather than Wu, Moon, Krupnova, Lawson and Choi – provided all costs associated with establishing the acupuncture professional corporations in the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, and all investment in the acupuncture professional corporations subsequent to the purchase of Wu, Moon, Krupnova, Lawson and Choi's acupuncture licenses by the Management Defendants.

186.    Wu, Moon, Krupnova, Lawson and Choi did not incur any costs to establish the acupuncture professional corporations' practices at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, nor did they invest any money in the acupuncture professional

corporations they purportedly owned subsequent to the purchase of their acupuncture licenses by the Management Defendants.

187.    The Management Defendants caused Wu, Moon, Krupnova, Lawson and Choi to commence operations at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, alongside the other professional corporations that the Management Defendants controlled.

188.    Wu, Moon, Krupnova, Lawson and Choi never were the true shareholders, directors, or officers of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture and never had any true ownership interest in or control over Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture.

189.    True ownership and control over the acupuncture professional corporations always rested entirely with the Management Defendants, who used the facade of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ acupuncture professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

190.    All decision-making authority relating to the operation and management of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture was vested entirely with the Management Defendants.

191.    In addition, Wu, Moon, Krupnova, Lawson and Choi never controlled or maintained any of Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi

Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; never hired or supervised any of their employees or independent contractors; and were completely unaware of fundamental aspects of how Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture operated.

192.    Specifically, and in keeping with the fact that the Management Defendants managed and controlled Choi Acupuncture: (i) Choi Acupuncture paid $5,000.00 per month to Billing 4 You for "billing" services; (ii) Billing 4 You had access to Choi's signature stamp and Billing 4 You deposited Choi Acupuncture's checks via a remote deposit machine; (iii) Choi does not know his account receivables; and (iv) Billing 4 You hires the collection lawyers for Choi Acupuncture.

193.    In addition, and also in keeping with the fact that the Management Defendants managed and controlled Choi Acupuncture, Choi Acupuncture paid $5,000.00 per month to All Network Marketing for networking services that consisted of, among other things, a single "party" in 2016.

194.    What is more, and also in keeping with the fact that the Management Defendants managed and controlled Choi Acupuncture, Choi was only present at Choi Acupuncture three days per week and travelled to 62-43A Woodhaven Boulevard, Rego Park to meet with Gulkarov and bring him insurance checks.

195.    Specifically, and in keeping with the fact that the Management Defendants managed and controlled Choice Acupuncture: (i) Choice Acupuncture paid $5,000.00 per month to Billing 4 You for "billing" services; (ii) Billing 4 You had access to Choi's signature stamp; and (iii) Billing 4 You had access to Choice Acupuncture's bank account in that they electronically deposited

insurance checks through a scanner at Billing 4 You and had the password to sign into Choice Acupuncture's account.

196.    In addition, and also in keeping with the fact that the Management Defendants managed and controlled Choice Acupuncture, Choice Acupuncture paid between $3,500.00 - $5,000.00 per month to All Network Marketing for networking services that included one "party" at the end of each year and "a few" meetings with lawyers.

197.    Jeff Harmonize Acupuncture, SJM Acupuncture, LK Acupuncture, PL Acupuncture, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture were used as vehicles by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

198.    Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the operations of the acupuncture professional corporations were subject to the pecuniary interests of non-acupuncturists as opposed to the independent medical judgment of true acupuncturists-owners.

**5.      The Fraudulent Ownership and Operation of the Physical Therapy Professional Corporations**

199.    The Management Defendants fraudulent scheme also involved the recruitment of licensed physical therapists who were willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could fraudulently incorporate and/or control a series of physical therapy professional corporations under the physical therapy professionals' names.

200.    Beginning in 2017, the Management Defendants recruited Shalaby, Kataeva, and Khallaf, all licensed physical therapists, who were willing to sell to the Management Defendants the

use of their professional licenses so that they could fraudulently incorporate and/or control PT of NY, Cityworks PT, and Handy PT.

201. Specifically, in 2017, the Management Defendants recruited Shalaby, a licensed physical therapist who was willing to sell them the use of his physical therapy license so that they could fraudulently control PT of NY and thereafter cause PT of NY to operate at the Hillside Avenue Medical Clinic. The Management Defendants used PT of NY to submit billing for the Fraudulent Services to GEICO.

202. In 2018, the Management Defendants recruited Khallaf, a licensed physical therapist who was willing to sell them the use of his physical therapy license so that they could fraudulently incorporate and/or control Handy PT and thereafter cause Handy PT to operate at the Flatlands Avenue Medical Clinic. The Management Defendants used Handy PT to submit billing for the Fraudulent Services to GEICO.

203. In 2019, the Management Defendants recruited Kataeva, a licensed physical therapist who was willing to sell them the use of her physical therapy license so that they could fraudulently incorporate and/or control Cityworks PT and thereafter cause Cityworks PT to operate at the Hillside Avenue Medical Clinic and Flatlands Avenue Medical Clinic. The Management Defendants used Cityworks PT to submit billing for the Fraudulent Services to GEICO.

204. Accordingly, the Management Defendants caused the following Defendants to be established at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic during the following years:

|      | Flatlands Avenue Medical Clinic | Hillside Avenue Medical Clinic |
|------|--------------------------------|-------------------------------|
| 2017 |                                | PT of NY (Shalaby)            |
| 2018 | Handy PT (Khallaf)             | PT of NY (Shalaby)            |
| 2019 | Cityworks PT (Kataeva)         | PT of NY (Shalaby)/ Cityworks PT (Kataeva) |
| 2020 | Cityworks PT (Kataeva)         | Cityworks PT (Kataeva)        |

205. Although Shalaby, Kataeva, and Khallaf are listed as the "owners" of record of PT of NY, Cityworks PT, and Handy PT, respectively, on the certificates of incorporation, Shalaby, Kataeva, and Khallaf exercised no ownership or control over the profits that were generated from the operation of PT of NY, Cityworks PT, and Handy PT, respectively. Rather, the day-to-day operations, supervisory control, and true ownership of PT of NY, Cityworks PT, and Handy PT rested in the hands of the Management Defendants.

206. In order to circumvent New York law preventing non-medical professionals from owning and controlling physical therapy professional corporations, the Management Defendants entered into a secret scheme with Shalaby, Kataeva, and Khallaf, wherein, in exchange for a designated salary or other form of compensation, Shalaby, Kataeva, and Khallaf each agreed to falsely represent that they were the true shareholders, directors, and officers of the physical therapy professional corporations and that they truly owned, controlled, and practiced through the physical therapy professional corporations.

207. Shalaby, Kataeva, and Khallaf each agreed to falsely represent that they were the true shareholders, directors, and officers of the physical therapy professional corporations and that they truly owned, controlled, and practiced through the physical therapy professional corporations,

knowing that the professional corporations were going to be used to submit fraudulent billing to insurers.

208.    The Management Defendants – rather than Shalaby, Kataeva, and Khallaf – provided all costs associated with establishing the physical therapy professional corporations in the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, and all investment in the physical therapy professional corporations subsequent to the purchase of Shalaby, Kataeva, and Khallaf's physical therapy licenses by the Management Defendants.

209.    Shalaby, Kataeva, and Khallaf did not incur any costs to establish the physical therapy professional corporations' practices at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, nor did they invest any money in the physical therapy professional corporations they purportedly owned subsequent to the purchase of their physical therapy licenses by the Management Defendants.

210.    The Management Defendants caused Shalaby, Kataeva, and Khallaf to commence operations at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, alongside the other professional corporations that the Management Defendants controlled.

211.    Shalaby, Kataeva, and Khallaf never were the true shareholders, directors, or officers of PT of NY, Cityworks PT, and Handy PT, respectively, and never had any true ownership interest in or control over the professional corporations.

212.    True ownership and control over the physical therapy professional corporations always rested entirely with the Management Defendants, who used the facade of the physical therapy professional corporations to do indirectly what they were forbidden from doing directly, namely: (i) employ physical therapy professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

213.     All decision-making authority relating to the operation and management of the physical therapy professional corporations was vested entirely with the Management Defendants.

214.     In addition, Shalaby, Kataeva, and Khallaf never controlled or maintained any of PT of NY, Cityworks PT, and Handy PT's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of their financial affairs; never hired or supervised any of their employees or independent contractors; and were completely unaware of fundamental aspects of how PT of NY, Cityworks PT, and Handy PT operated.

215.     PT of NY, Cityworks PT, and Handy PT were used as vehicles by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.

216.     Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the operations of the physical therapy professional corporations were subject to the pecuniary interests of non-physical therapists as opposed to the independent medical judgment of true physical therapist-owners.

**B.     The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants By Imposing Sham Financial Arrangements**

217.     The Management Defendants used each of the Provider Defendants as vehicles so that they could illegally profit from the Fraudulent Services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

218.     To conceal their illegal financial and referral relationships, and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into sham "management," "billing,"

"collection," "transportation," "lease," and "marketing" agreements, and/or other financial arrangements.

219.    These agreements or financial arrangements called for payments that were purportedly for the performance of certain designated services including management, marketing, billing, collections, transportation, leasing, etc., but were in actuality (i) sham agreements and arrangements; (ii) not reflective of the fair market value or the actual value of the services provided; and (iii) decoys to conceal the Management Defendants' illegal ownership and control over the Provider Defendants.

220.    In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to present the illusion that the Provider Defendants were paying legitimate fees for "management," "billing," "collection," "transportation," and "marketing" services, and/or for facility space and equipment, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider Defendants and (ii) siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

221.    The net effect of these "management," "billing," "collection," "transportation," "marketing," "lease," and/or other financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations and healthcare practices, their accounts receivable, and all revenues generated therefrom.

222.    Through all of these "billing," "collection," "management," "transportation," "marketing" and/or "lease" agreements, the Management Defendants maintained complete control

of all of the healthcare providers operating at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic, their accounts receivable, and all revenues that generated therefrom.

223.    The Management Defendants used the Provider Defendants as vehicles so that they could illegally profit from professional healthcare services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

###    C.    Defendants' Fraudulent Treatment and Billing Protocol

224.    Defendants, using a fraudulent treatment and billing protocol, executed a complex fraudulent scheme designed to bill GEICO and the New York automobile insurance industry for the performance of the Fraudulent Services.

225.    The Provider Defendants, in accordance with the Management Defendants' pre-determined fraudulent treatment and billing protocol, subjected Insureds to a myriad of illusory and medically unnecessary healthcare services.

226.    Defendants thereafter purported to subject virtually every Insured to a medically unnecessary course of "treatment" – regardless of the severity of the accident or the nature of the Insured's injuries (or lack of any injuries) – that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

227.    As part of the scheme, Defendants purported to subject the Insureds to medically unnecessary "testing" provided pursuant to a pre-determined, fraudulent protocol, which was applied without regard for the Insureds' individual symptoms or presentment, or absence of any actual medical problems arising from any actual automobile accidents.

228.    Each step in the fraudulent testing and treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

229.     Patients purportedly underwent an initial examination, and as a result, each patient was diagnosed with conditions that varied little, with the examining provider consistently concluding that the same predetermined, excessive, and unnecessary treatment was medically necessary for each patient. The examinations invariably led to voluminous physical therapy treatments, chiropractic services, acupuncture services, and diagnostic testing consisting of computerized range of motion and muscle testing, physical performance testing and nerve conduction velocity tests and electromyography tests.

230.     No legitimate physician or health services practitioner would have permitted the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

231.     Ajudua, Luna, Wu, Moon, Krupnova, Lawson, Khallaf, Kataeva, Park, Choi, and Shalaby permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because: (i) the Provider Defendants were secretly and unlawfully owned and controlled by the Management Defendants – non-physicians whose focus was on profit rather than on patient care; and (ii) Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.     The Fraudulent Initial Examinations**

232.     Defendants purported to provide virtually every Insured with an initial examination.

233.     The initial examinations were performed – to the extent that they were performed at all – to provide Insureds with pre-determined diagnoses to allow for the performance of a host of medically unnecessary or illusory services.

234.     Typically, Ajudua or another medical professional employed by or associated with Starrett City Medical or Hillcrest Medical purported to provide the initial examinations at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

235.     Starrett City Medical, Hillcrest Medical, and Ajudua (along with the Management Defendants, collectively referred herein as the "Examining Defendants") typically billed the initial examinations to GEICO under current procedural terminology ("CPT") codes: (i) 99205, typically resulting in a charge of $200.68 per exam; (ii) 99204, typically resulting in a charge of $148.69; or (iii) 99203, typically resulting in a charge of $104.07.

236.     The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants, not to treat or otherwise benefit the Insureds.

237.     Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

238.     According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99205 typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

239.     The use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

240.     The use of CPT code 99203 typically requires that the physician spend at least 30 minutes of face-to-face time with the Insured or the Insured's family.

241.     Though the Examining Defendants routinely billed for the initial examinations under CPT codes 99203, 99204, and 99205, no medical practitioner employed by or associated with Starrett City Medical or Hillcrest Medical ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 45 or 60 minutes. Rather, the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

242.     In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, much less 45 or 60 minutes, the Examining Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

243.     All that was required to complete the boilerplate forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

244.     These interviews and examinations did not require any medical professional employed by or associated with Starrett City Medical or Hillcrest Medical to spend more than 10-15 minutes of face-to-face time with the Insureds, let alone 45 or 60 minutes.

245.     According to the Fee Schedule, the use of CPT codes 99203, 99204, or 99205 typically requires that the Insured presented with problems of moderate or moderate-to-high severity.

246.     Though the Examining Defendants routinely billed for the initial examinations under CPT codes 99203, 99204, and 99205, the Insureds did not present with problems of moderate

or moderate-to-high severity as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

247.    What is more, even though the Insureds almost never presented with problems of moderate or moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate or moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

248.    In addition, according to the Fee Schedule, when the Examining Defendants submitted charges for initial examinations under CPT code 99203, they represented that they: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity".

249.    According to the Fee Schedule, when the Examining Defendants submitted charges for initial examinations under CPT code 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

250.    Further, according to the Fee Schedule, when the Examining Defendants submitted charges for initial examinations under CPT code 99205, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity."

      (i)    Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories

251.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not

qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

252.   Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

253.   The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

254.     When the Examining Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

255.     In fact, no Examining Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

256.     Rather, after purporting to provide the initial examinations, the Examining Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

257.     These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to provide and then billed to GEICO and other insurers.

258.     Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

259.     Pursuant to the Fee Schedule, a "detailed" patient history also requires that the healthcare provider take a past medical history, family, and social history from the patient to the extent that the patient's past medical history, family, and social history is related to the patient's presenting problems.

260.     However, no Examining Defendant ever took a "detailed" patient history from Insureds during the initial examinations, inasmuch as they did not review systems related to the patients' presenting problems, did not conduct any review of a limited number of additional

systems, and did not take a past medical history, family, and social history from the patients to the extent that the patients' past medical history, family, and social history were related to the patients' presenting problems.

261.    Rather, after purporting to provide the initial examinations, the Examining Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

262.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

> (ii)    Misrepresentations Regarding "Comprehensive" and "Detailed" Physical Examinations

263.    Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

264.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

265.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

266.    When the Examining Defendants billed for the initial examinations under CPT codes 99204 or 99205, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

267.    In fact, no Examining Defendants ever conducted a general examination of multiple patient organ systems or conducted a complete examination of a single patient organ system.

268.    For instance, no Examining Defendants ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

269.    Furthermore, although the Examining Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial

examinations, the musculoskeletal examinations did not qualify as "complete", because they failed

to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

270.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

271.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

272.    When the Examining Defendants billed for the initial examinations under CPT codes 99203, they falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations.

273.    In fact, the Examining Defendants never conducted a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making

274.    In addition, when the Examining Defendants submitted charges for initial examinations under CPT code 99205, they represented that they engaged in medical decision-making of "high complexity."

275.    When the Examining Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

276.    When the Examining Defendants submitted charges for initial examinations under CPT code 99203, they represented that they engaged in medical decision-making of "low complexity."

277.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

278.    Though the Examining Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT code 99205), "moderate complexity" (when billed under CPT code 99204), or "low complexity" (when billed under CPT code 99203), in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms.

279.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Examining Defendants for "treatment" at the Flatlands Avenue Medical Clinic or Hillside Avenue Medical Clinic, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Examining Defendants did not request any medical records from any other providers, nor conducted any diagnostic tests.

280.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

281.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Examining Defendants if properly administered, to the extent that the Examining Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

282.    In almost every instance, any diagnostic procedures and "treatments" the Examining Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

283.    Third, the Examining Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

284.    Rather, to the extent that the initial examinations were conducted in the first instance, the Examining Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

285.    The Examining Defendants prepared phony initial examination reports in which they provided boilerplate sprain and strain diagnoses to virtually every Insured.

286.    Based upon these supposed "diagnoses", the Examining Defendants directed Insureds to return to the Flatlands Avenue Medical Clinic or the Hillside Avenue Medical Clinic several times per week for medically unnecessary follow-up examinations, physical therapy, diagnostic testing, chiropractic treatment, and acupuncture.

287.    The putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

### 2.    The Fraudulent Follow-Up Examinations

288.    In addition to the fraudulent initial examinations, the Examining Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

289.    The Examining Defendants typically billed the follow-up examinations to GEICO under CPT code 99213, resulting in a charge of $64.07 or CPT code 99214, resulting in a charge of $92.98.

290.    Like the Examining Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the Management Defendants directive, as well as the illegal kickbacks and fraudulent treatment protocol.

291.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

292.    The use of CPT code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family.

293.    The use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

294.    Though the Examining Defendants routinely billed for the follow-up examinations under CPT codes 99213 or 99214, no physician associated with the Examining Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 25 minutes. Rather, the follow-up examinations rarely lasted no more than 10 minutes, to the extent that they were conducted at all.

295.    In most cases, the Examining Defendants did not actually provide any legitimate follow-up examination but instead issued bogus, boilerplate "follow-up examination" reports to further support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

**3.    The Fraudulent Computerized Range of Motion and Muscle Tests**

296.    In addition to the other Fraudulent Services, many Insureds were subjected to one or more sessions of medically useless computerized range of motion and muscle testing ("ROM/MT") in an attempt to maximize the fraudulent billing submitted to GEICO.

297.    Like the charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that the ROM/MT was medically unnecessary and was performed – to the extent that it was performed at all – pursuant to the Management Defendants' pre-determined fraudulent

treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

298.    Typically, Starrett City Medical, Hillcrest Medical, Ajudua, Handy PT, Khallaf, PT of NY and Shalaby (along with the Management Defendants, referred herein as the "ROM/MT Defendants"),  purported to provide ROM/MT at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

299.    The ROM/MT Defendants then submitted bills for ROM/MT to GEICO under multiple units of CPT codes 95851 and 95831, generally resulting in total charges over $500.00 for each session of ROM/MT "testing."

300.    The ROM/MT Defendants typically billed the computerized range of motion tests to GEICO as multiple charges of $45.71 under CPT code 95851, generally for each round of testing.

301.    The ROM/MT Defendants typically billed the computerized muscle strength tests to GEICO as multiple charges of $43.60 under CPT code 95831, generally for each round of testing.

302.    Like Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that the ROM/MT was medically unnecessary and was performed – to the extent it was performed at all – pursuant to the Management Defendants directive, as well as the illegal kickbacks and fraudulent treatment protocol.

(i)    <u>Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength</u>

303.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged, or ball-and-socket variety. The body's hinged joints and ball-

and-socket joints facilitate movement, allowing a person to – for example – bend a knee, rotate a shoulder, or move the neck to one side.

304.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the degree of movement around the joint.

305.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement around the joint in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

306.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles proximal to a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

307.    Physical examinations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a reference for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, it will limit substantially the ability to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

308.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the examinations.

309.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

(ii)    The ROM/MT Defendants' Duplicate Billing for Medically Unnecessary ROM/MT

310.    To the extent that the Examining Defendants actually provided the examinations that were billed to GEICO, the Examining Defendants provided manual range of motion tests and manual muscle strength tests to each Insured during each examination.

311.    The charges for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the Examining Defendants routinely submitted for the initial examinations under CPT codes 99203, 99204, or 99205, and for the follow-up examinations under CPT codes 99213 or 99214.

312.    Despite the fact that the ROM/MT Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle testing during their examinations, and despite the fact that the ROM/MT Defendants knew that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, the ROM/MT Defendants systemically billed for, and purported to provide, ROM/MT to Insureds.

313.    Though the Insureds routinely visited the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic several times per month for follow-up examinations and other

Fraudulent Services, the ROM/MT Defendants often deliberately scheduled separate appointments for ROM/MT so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

314.    The ROM/MT Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

315.    The ROM/MT Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

316.    The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of each Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

317.    While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the ROM/MT Defendants it represented purposeful and

unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

318.    The ROM/MT were part and parcel of Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Defendants.

(iii)    The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Strength Tests

319.    Not only did the ROM/MT Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, the ROM/MT Defendants also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

320.    Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

321.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 for the ROM/MT under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

322.    The ROM/MT Defendants purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

323.    To the extent the ROM/MT Defendants actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of motion and muscle strength tests – together – never took more than 15 minutes to perform. Thus, even if the ROM/MTs that the ROM/MT Defendants purported to provide were medically necessary, and performed in the first instance, Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

324.    In order to maximize their fraudulent billing for the ROM/MT, the ROM/MT Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 (for the muscle strength tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

325.    By unbundling what should – at most – have been a single $45.71 charge under CPT code 97750 into multiple charges under CPT codes 95831, and 95851 the ROM/MT Defendants typically inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude.

(iv)    The Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT

326.    Not only were the ROM/MT Defendants' charges for the ROM/MT fraudulent because the tests were medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

327.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT codes 95851 or for computerized muscle testing

using CPT codes 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

328.     Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95851 and 95831, Defendants did not prepare written reports interpreting the data obtained from the tests.

329.     The ROM/MT Defendants did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were provided as part of the Management Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich Defendants at the expense of GEICO and other insurers.

330.     In keeping with the fact that the ROM/MT were medically unnecessary and were performed pursuant to the Management Defendants' pre-determined fraudulent treatment protocol, the results of the ROM/MT, like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**4.     The Fraudulent Charges for Physical Performance Tests**

331.     In addition to the other Fraudulent Services, many Insureds were subjected to medically useless "physical performance testing" ("PPT") at the direction of the Management Defendants.

332.     Like the charges for the other Fraudulent Services, the charges for the PPT were fraudulent in that the PPT were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Management Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

333.    Ajudua, Starrett City Medical, Hillcrest Medical, Khallaf, Handy PT, Shalaby and PT of NY (along with the Management Defendants, referred herein as the "PPT Defendants") typically purported to provide PPT at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

334.    The PPT Defendants submitted bills for PPT to GEICO under multiple units of CPT codes 97750, generally resulting in a total charge between $274.26 and $698.57 for each session of PPT.

335.    The PPT Defendants purported to provide PPT tests to Insureds despite their actual knowledge that the PPT tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were performed during every examination and/or the computerized ROM tests and muscle strength tests that frequently were purported to be performed on intervening dates.

336.    Much like the duplicative computerized ROM tests and muscle strength tests, the only substantive difference between PPT tests and the manual range of motion and manual muscle strength tests purportedly provided by the Examining Defendants during the examinations, is that PPT tests generate a digital printout of an Insured's range of motion and/or muscle strength.

337.    The range of motion and muscle strength data obtained through the use of PPT tests are not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by Defendants to Insureds.

338.    Nor were the range of motion and muscle strength data obtained through the use of PPT tests significantly different from the data that the ROM/MT Defendants obtained through the computerized range of motion and muscle strength tests they purported to provide to Insureds.

339.    In keeping with the fact that PPT tests were medically unnecessary and were performed pursuant to the Management Defendants' pre-determined fraudulent treatment protocol, the results of PPT tests, like the other Fraudulent Services, were never incorporated into the Insureds' respective treatment plans.

### 5.    The Fraudulent Electrodiagnostic Tests

340.    Based upon the fraudulent, pre-determined "diagnoses" the Examining Defendants purported to provide to Insureds during the ersatz initial "examinations", Defendants purported to subject many Insureds to a series of medically unnecessary electrodiagnostic tests, including nerve conduction velocity ("NCV") and electromyography ("EMG") tests (collectively, the "electrodiagnostic" or "EDX" tests).

341.    Ajudua, Starrett City Medical and Hillcrest Medical (along with the Management Defendants, referred herein as the "EDX Defendants") typically purported to provide the electrodiagnostic tests at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

342.    The EDX Defendants virtually always billed the electrodiagnostic tests to GEICO as multiple charges using CPT codes 95861, 95864, 95903, 95904, and 95934, which almost always resulted in charges of at least $1,500.00, but usually more than $3,000.00, for each Insured on whom the electrodiagnostic testing purportedly was performed.

343.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Management Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

(i)      The Human Nervous System and Electrodiagnostic Testing

344.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, extending through the arms and legs and into the hands and feet.

345.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

346.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

347.    Peripheral nerves consist of both sensory and motor fibers. They carry electrical impulses throughout the body, to and from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

348.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, atrophy, loss of muscle control, and alteration of reflexes.

349.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided to Insureds because they were medically necessary to determine whether the Insureds had radiculopathies.

350.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

351.    The Recommended Policy accurately reflects the demonstrated utility of certain forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(ii)    The Fraudulent Charges for NCV Testing

352.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity").

353.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

354.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

355.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies

generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

356.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

357.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EDX Defendants often purported to perform testing on far more nerves than recommended by the Recommended Policy.

358.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, the EDX Defendants often purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies, all supposedly to determine whether the Insureds suffered from a radiculopathy.

359.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which NCVs test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT code 95934 for each H-reflex test that is performed on the nerves of the lower limb.

360.    The EDX Defendants often purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent

charges that they could submit to GEICO and other insurers, not because the NCV tests were

medically necessary to determine whether the Insureds have radiculopathies or any other medical

condition.

361.    What is more, the decision of which peripheral nerves to test in each limb and

whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such

peripheral nerve must be tailored to each patient's unique circumstances.

362.    In a legitimate clinical setting, this decision is determined based upon a history and

physical examination of the individual patient, as well as the real-time results obtained as the NCV

tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

363.    As a result, the nature and number of the peripheral nerves and the type of nerve

fibers tested with NCV tests should vary from patient-to-patient.

364.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic
> consultant for each patient.  The examination design is dynamic and often changes
> during the course of the study in response to new information obtained.

365.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set

protocols automatically testing a large number of nerves are not appropriate."

366.    Even so, the EDX Defendants did not tailor the NCV tests they purported to perform

and/or provide to the unique circumstances of each individual Insured.

367.    Instead, they applied a fraudulent "protocol" and purported to perform and/or

provide NCV tests on the same peripheral nerves and nerve fibers in the NCV test claims identified

in Exhibits "1" and "2".

368.    Though the NCVs are allegedly rendered to Insureds in order to determine whether

the Insureds suffered from radiculopathies, there was no adequate neurological history and

examination performed to create a foundation for the EDX testing. In actuality, NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

369.    The cookie-cutter approach to the NCV tests that the EDX Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

(iii)    The Fraudulent Charges for EMG Tests

370.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

371.    Though, in some cases, the EDX Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, the EDX Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

372.    In actuality, to the extent that the EDX Defendants purported to provide EMG tests to Insureds at all, the tests were provided as part of Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

373.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

374.    Even so, the EDX Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, the EDX Defendants often tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

375.    Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that the EDX Defendants purported to provide and/or perform often exceed the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

376.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

377.    Nonetheless, in the claims for EMG tests identified in Exhibits "1" and "2", the EDX Defendants often purported to provide and/or perform EMG tests on four limbs, in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to GEICO.

378.    If all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i)

$185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

379.    The EDX Defendants often purported to perform and/or provide EMG tests on muscles in all four limbs for the Insureds solely to maximize the profits that they could reap from each such Insured.

380.    Further evidence that the EDX tests were fraudulent, medically unnecessary, and were performed pursuant to the Management Defendants' pre-determined fraudulent treatment protocol is the fact that they were performed in violation of the restrictions imposed by the New York State Department of Health Office of Professional Medical Misconduct.

381.    More specifically, Delys St. Hill, M.D., a physician associated with both Starrett City Medical and Hillcrest Medical, was found guilty by OPMC on August 25, 2016, of professional misconduct by having committed negligence on more than one occasion; ordering excessive EMG/NCV tests and treatments which were not warranted by the patient's condition; practicing fraudulently and failing to maintain accurate patient medical records. Dr. St. Hill's medical license was suspended ninety days and subject to probation for five years.

382.    The probation included being required to use a practice monitor. Specifically, Dr. St. Hill would only practice medicine when her practice was being monitored by a physician board certified in an appropriate specialty (i.e. neurology or physical medicine and rehabilitation). Dr. St. Hill's probation was effective December 21, 2016.

383.    Not only was Ajudua, Starrett City Medical,  and Hillcrest Medical not aware of the disciplinary issues plaguing Dr. St. Hill, upon information and belief, no practice monitor was assigned to Dr. St. Hill when she performed EDX tests on behalf of Starrett City Medical  and Hillcrest Medical after December 21, 2016, as reflected in Exhibits "1" and "2".

384.    What is more, both Lyudmila Poretskya, M.D. ("Poretskaya") and Madhu Boppana, M.D. ("Boppana"), physicians associated with both Starrett City Medical and Hillcrest Medical, have previously been sued based on allegations that they submitted fraudulent bills for medically unnecessary services, including EDX tests, purportedly provided pursuant to predetermined fraudulent protocols designed solely to maximize billing. See GEICO v. Northern Medical Care, P.C., et al., 1:20-cv-01214 (E.D.N.Y. 2020) (RRM)(SMG); GEICO v. Lyudmila Poretskya, et al., 2:16-cv-08448 (D.N.J. 2016)(JMV)(JBC); GEICO v. Miller, et al., 2:13-cv-02706 (E.D.N.Y. 2013)(LDW)(GRB).

**6.    The Fraudulent Charges for LINT/TPII Treatment**

385.    As set forth in Exhibit "4", based upon the fraudulent, pre-determined "diagnoses" they purported to provide to virtually every Insured at the conclusion of their putative initial and follow-up examinations, Kings Chiropractic and Luna purported to provide many Insureds with Localized Intense Neurostimulation Therapy and Trigger Point Impedance Imaging ("LINT/TPII Treatment") using something called a Nervomatrix Device.

386.    Kings Chiropractic and Luna (along with the Management Defendants, referred herein as the "LINT/TPII Defendants") purported to perform virtually all of the LINT/TPII Treatments, which then were billed to GEICO under CPT codes 95999 and 99199, typically resulting in a charge of between $1,239.65 and $6,198.25 per session.

387.     Like the charges for the other Fraudulent Services, the charges for the LINT/TPII Services were fraudulent in that they misrepresented Kings Chiropractic and Luna's eligibility to collect No-Fault Benefits in the first instance.

388.     In fact, Kings Chiropractic and Luna never were eligible to collect No-Fault Benefits in connection with the claims identified in Exhibit "4", because – as a result of the fraudulent scheme described herein – neither they nor the LINT/TPII Treatments were in compliance with all relevant laws and regulations governing healthcare practices in New York.

389.     What is more, in the claims for LINT/TPII Treatments, the charges for the LINT/TPII Treatments were fraudulent in that the LINT/TPII Treatments were medically useless and were provided, to the extent that they were provided at all, solely in order to maximize the billing submitted through the LINT/TPII Defendants, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(i)     Standard of Care for the Diagnosis and Treatment of Trigger Points

390.     Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

391.     In a legitimate clinical setting, trigger points are diagnosed as part of a standard physical examination based upon pain that results when pressure is applied to a specific area of a patient's body.

392.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

393.     Should an initial course of conservative therapies fail to remediate trigger points, trigger point injections may be warranted. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

(ii)     The Medically Useless LINT/TPII Treatment

394.     LINT/TPII Treatment is a two-step process that purports to use the Nervomatrix Device to both diagnose and treat trigger points. First, the Nervomatrix Device allegedly identifies the most clinically relevant active trigger points along a person's skin by measuring electrical resistance on the skin surface, which generates a two-dimensional image of skin impedance. Then a moving row of twenty-six miniature probes that touch, but do not penetrate the skin surface, provide electrical pulses to the targeted trigger points. These electrical pulses purportedly stimulate the release of endorphins to alleviate a patient's pain. Typically, LINT/TPII Treatment is administered once per week over the course of six weeks for 30 minutes sessions.

395.     In actuality, however, LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points.

396.     In keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the Nervomatrix Device has never been approved by the Food and Drug Administration ("FDA")  to be used in the diagnosis and treatment of trigger points.

397.     What is more, there are no reliable, peer-reviewed data that establish the effectiveness of the Nervomatrix Device and LINT/TPII Treatment. Indeed, studies have found that the Nervomatrix Device does not actually improve a patient's back pain and does not result in

a better outcome than a placebo treatment. Notably, the only published data that actually contends that the Nervomatrix Device is effective in diagnosing and treating trigger points was published in 2011 by Dr. Miguel Gorenberg, the founder of a Delaware company that developed and manufactured the Nervomatrix Device – Nervomatrix.

398.     In further keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Nervomatrix ceased operations in 2018 and was dissolved on February 17, 2019. In addition, the company's website, soleve.com, is no longer operational. Although the Nervomatrix Device had been available in the United States since at least 2014, presently, only twelve known providers submit bills to GEICO for LINT/TPII Treatments using the Nervomatrix Device. By way of contrast, since January 1, 2019, more than nine hundred eighty-one (981) different providers have submitted bills to GEICO for trigger point injections.

399.     In further keeping with the fact that that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points: (i) the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for LINT/TPII Treatment; and (ii) the putative "results" of the LINT/TPII Treatments purportedly performed by the LINT/TPII Defendants: (a) were not incorporated into any Insured's treatment plan; (b) played no legitimate role in the overall treatment or care of the Insureds; and (c) had minimal, if any, impact on the Insureds' range of motion deficits and level of back pain.

7.      **The Fraudulent Acupuncture Treatment**

400.      In addition to the other Fraudulent Services that Defendants purported to provide, Defendants purported to subject many Insureds to a series of medically unnecessary acupuncture treatments at the direction of the Management Defendants.

401.      Wu, Jeff Harmonize Acupuncture, Moon, SJM Acupuncture, Krupnova, LK Acupuncture, Lawson, PL Acupuncture, Choi, Choi Acupuncture, Choice Acupuncture, and Choi-Go Acupuncture (collectively, with the Management Defendants, the "Acupuncture Defendants") purported to subject Insureds to a series of medically unnecessary acupuncture treatments at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

402.      Like Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it was performed at all – pursuant to the Management Defendants' directive, not to treat or otherwise benefit the Insureds.

403.      The predetermined, fraudulent protocol was grounded on fabricated exams and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

(i)      Legitimate Acupuncture Practices

404.      Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

405.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

406.    The first step in any legitimate acupuncture treatment is a physical examination of the patient. The two most critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these elements of the physical examination is necessary to diagnose the patient's condition and thereby develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.  In cases involving trauma, an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

407.    The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

408.    In developing a legitimate acupuncture treatment plan, an acupuncturist may choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

409.    The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan. If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between 5 and 10 Acupuncture Points. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

410.    Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

411.    Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

(ii)    The Acupuncture Defendants' Fraudulent Examinations

412.    The Acupuncture Defendants purported to begin treatment of Insureds with an initial examination which typically was billed under CPT codes 99203, resulting in a charge of $75.00.

413.    The charges for the initial acupuncture examinations were fraudulent in that the examinations (i) were medically unnecessary; (ii) were performed as part of the fraudulent treatment protocol and illegal financial arrangements between and among Defendants, and (iii) misrepresented the nature and extent of the initial acupuncture examinations.

414.    Pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

415.    By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

416.    Even so, the Acupuncture Defendants routinely billed for their putative examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they actually had any presenting problems at all.

417.    The Acupuncture Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity. Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that Defendants purported to provide to the Insureds, including acupuncture services.

418.    Further, the use of CPT code 99203 typically requires that the practitioner spend 30 minutes of face-to-face time with the Insured or the Insured's family.

419.    Though the Acupuncture Defendants typically billed for the initial examinations under CPT code 99203, no acupuncturist associated with the Acupuncture Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations.

Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

420.    In keeping with the fact that the initial examinations rarely lasted more than 10 minutes – to the extent they were conducted at all – the Acupuncture Defendants used pre-printed checklist or template forms in conducting the examinations.

421.    The pre-printed checklist and template forms that the Acupuncture Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations.

422.    All that was required to complete the pre-printed checklist and template forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs and basic range of motion and muscle strength testing. In fact, the examination findings were a simple reiteration of the Insureds' subjective complaints or general descriptions of their injuries. There was no assessment of the Insureds' conditions.

423.    These interviews and examinations did not require any acupuncturists associated with the Acupuncture Defendants to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

424.    Further, the purported examinations provided by the Acupuncture Defendants did not remotely comport with any of the basic, legitimate acupuncture requirements.  For example, the examinations:

   (i)     failed to include palpation findings as there was no specific areas of tenderness or pain, and/or specific muscle spasms detailed;

   (ii)    failed to include visual examination findings such as gait changes, antalgic lean, and/or postural distortions;

   (iii)   had no assessment of range of motion or impairment of activities of daily living detailed;

(iv)    failed to include the specific location of the injuries; and

(v)    failed to document specific channels or Acupuncture Points.

425.    No objective clinical findings were documented, therefore, the examinations were not medically necessary. Indeed, they were designed solely to enrich the Acupuncture Defendants.

(iii)    The Acupuncture Defendants' Fraudulent Acupuncture Treatments

426.    Following the fraudulent initial examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810, 97811, and 97813, typically resulting in charges of $30.00, $25.69, and $22.48, respectively, for each treatment segment. Jeff Harmonize Acupuncture also billed GEICO under CPT Code 97814, typically resulting in a charge of $19.54 for each treatment segment.

427.    The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements. Instead, at best, they consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and was not designed to effectively treat or otherwise benefit the Insureds. As such, these acupuncture treatments were not medically necessary. Indeed, they were designed solely to enrich the Acupuncture Defendants through the submission of fraudulent charges to GEICO and other insurers.

428.    For instance:

(i)    needles were inserted into a small range of common and repetitive Acupuncture Points that were clinically useless, often bore no relation to the diagnosed condition, and appeared to have been pre-determined solely for the sake of expediency;

(ii)    there was a very high frequency of treatment sessions that were not supported by the alleged injuries and were not adjusted to reflect the Insureds' improvement or lack thereof;

(iii)   in many cases, injuries noted in the initial acupuncture physical examination reports were not addressed or treated in any manner;

(iv)   in many cases, there was billing for the treatment of injuries when those injuries never actually were treated. For example, the same treatment points were repeated without change or adjustment and patients with different injuries purportedly received the same treatments; and

(v)   generally, the treatments rendered were inadequate, did not follow the treatment plans established by the initial examinations, if any, and were not intended to actually address the Insureds' injuries.

429.   The services billed by the Acupuncture Defendants also reflected a lack of independent professional judgment and instead reflected a predetermined protocol designed to enrich Defendants through the submission of charges to GEICO.

430.   Furthermore, the documentation of the purported acupuncture treatments rendered under the names of the Acupuncture Defendants demonstrates that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to track their improvement or lack of improvement, or to adjust the treatment to reflect the patients' improvement or lack of improvement. The documentation of the treatment further demonstrates that, to a significant extent, it is used as nothing more than a sham to support a predetermined and fraudulent treatment protocol.

431.   The Acupuncture Defendants' cookie-cutter treatment protocol is further established by the Acupuncture Defendants routinely billing the same number of units of acupuncture per treatment date per patient, purportedly consisting of up to 45 minutes of personal, one-on-one contact at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

432.   The Fee Schedule sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

| 97810 | Acupuncture, one or more needles, without electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient |
|---|---|
| 97811 | without electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |
| 97813 | with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |
| 97814 | with electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |

433.    The purported acupuncture treatment described in the Acupuncture Defendants' treatment notes in almost all cases fails to justify the billing submitted for multiple units of personal, one-on-one contact, along with re-insertion, for multiple units of treatment.

434.    Defendants' fraudulent billing scheme misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to GEICO. Specifically, the Acupuncture Defendants uniformly submitted billing to GEICO for multiple segments of purported one-on-one contact rendered on the same day for each Insured, notwithstanding the fact that the "treatments" allegedly rendered by the Acupuncture Defendants were (or could have been) rendered in one treatment segment.

435.    The Acupuncture Defendants further fraudulently inflated their billing by charging for an "adjunct" acupuncture procedure, known as cupping. Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area. Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendants billed for cupping very frequently, without any evidence of effectiveness.

436.    The Acupuncture Defendants' cookie-cutter approach to the acupuncture "treatments" that they performed, or caused to be performed, on Insureds clearly was not based on medical necessity. Instead, the Acupuncture Defendants' cookie-cutter approach to the acupuncture "treatments" was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**8.    The Fraudulent Chiropractic Treatment**

437.    In addition to the other Fraudulent Services that Defendants purport to provide, Luna, Flatlands Chiropractic, Kings Chiropractic, Park, Your Choice Chiropractic, All About Chiropractic, and J Park Chiropractic (collectively with the Management Defendants, the "Chiropractic Defendants") routinely purported to subject Insureds to chiropractic at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic.

438.    The charges for chiropractic treatments were fraudulent in that the services were unnecessary and performed as part and parcel of the Management Defendants' fraudulent treatment and billing protocol and the Management Defendants' directive.

439.    Luna, Flatlands Chiropractic, and Kings Chiropractic purported to provide Insureds a series of medically unnecessary chiropractic treatments at the Flatlands Avenue Medical Clinic.

440.    Park, Your Choice Chiropractic, All About Chiropractic, and J Park Chiropractic purported to provide Insureds a series of medically unnecessary chiropractic treatments at the Hillside Avenue Medical Clinic.

(i)    The Chiropractic Initial and Follow-Up Examinations

441.    In addition to the initial and follow-up examinations conducted by the Examining Defendants, the Chiropractic Defendants purported to subject Insureds to one or more initial and follow-up chiropractic examinations.

442.     The Chiropractic Defendants' initial examinations were routinely billed under CPT code 99203, typically resulting in a charge of $54.74. The follow-up examinations were routinely billed under code 99212, typically resulting in a charge of $26.41.

443.     The Chiropractic Defendants' charges for the initial examinations misrepresented the extent of the services.

444.     Specifically, the use of CPT code 99203 represents that the practitioner typically spend 30 minutes of face-to-face time with the Insured or the Insured's family.

445.     Though the Chiropractic Defendants routinely billed for the initial examinations under CPT code 99203, the chiropractors associated with the Chiropractor Defendants rarely, if ever, spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

446.     To the extent that the chiropractic examinations were conducted in the first instance, the Chiropractic Defendants provided a pre-determined laundry-list of phony "diagnoses" for every Insured, and prescribed virtually identical courses of treatment.

447.     In addition, the diagnoses and treatment plans bore no actual relationship to the conditions actually presented, but were simply recited as a matter of course in order to justify the performance of the chiropractic services.

(ii)     The Chiropractic Treatment

448.     Like the charges for the other Fraudulent Services, the chiropractic treatment was performed by the Chiropractic Defendants – to the extent that it was performed at all – pursuant to the Management Defendants' directive, not to treat or otherwise benefit the Insureds.

449.     Pursuant to the Management Defendants' fraudulent pre-determined treatment and billing protocol, Ajudua or other medical professionals associated with Starrett City Medical and/or Hillcrest Medical routinely referred patients to the Chiropractic Defendants for chiropractic services.

450.     Initially, the Chiropractic Defendants diagnosed Insureds with sprains and strains and invariably concluded that Insureds required a treatment plan that included chiropractic adjustments of multiple regions several times per week, typically on the same day they received multiple physical therapy modalities, and often on the same day they received acupuncture, generally resulting in thousands of dollars of charges for each Insured.

451.     The Chiropractic Defendants purported to provide this identical chiropractic treatment plan to virtually every Insured, regardless of the Insureds' individual circumstances or unique presentment, to submit as much billing as possible for chiropractic services, without regard for medical necessity.

452.     Based on the nature of the minor accidents, it is highly unlikely that nearly all of the Insureds who presented to the Chiropractic Defendants at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic for treatment suffered injuries as the result of the accidents they purportedly experienced which required extended chiropractic services.

453.     Nonetheless, following the initial examinations and follow-up examinations, Insureds were prescribed and given a medically unnecessary, extended course of chiropractic services. In fact, the Chiropractic Defendants purported to provide Insureds with weeks or months of chiropractic services, including chiropractic manipulation treatments that were generally billed under CPT code 98941 (3-4 regions) and myofascial release or trigger point therapy services that were billed under CPT code 97139.

454.    The purported results of Defendants' other Fraudulent Services (i.e., examinations, ROM/MT, and PPT tests) were used by Defendants as continued justification for the rounds of chiropractic treatments, despite the fact the Chiropractic Defendants did not incorporate the "findings" of the other Defendants or the results of the other Fraudulent Services into the chiropractic treatment, nor was there ever any assessment or modification of the chiropractic treatment. For example:

      (i)     no details were provided to distinguish which vertebral levels were treated or the length or duration of the adjunctive therapies that were applied;

      (ii)    there was no evidence that the purported muscle spasm/hypertonicity and range of motion restrictions were specifically documented for each patient;

      (iii)   the treatment/progress notes provided no specifics as to how or where chiropractic manipulations and/or myofascial release/trigger point therapy were applied; and

      (iv)   no ongoing assessment of the patient's condition or their progress was documented.

455.    The weeks or months of continued, unchanging chiropractic treatments that were performed on virtually every Insured were not based on medical necessity and not intended to resolve the complaints/symptoms of the Insureds. Instead, the "protocol" approach to the performance of chiropractic treatments was designed solely to maximize the charges that Defendants could submit to GEICO, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol.

**9.    The Fraudulent Charges for Physical Therapy Treatment**

456.    As part of the Management Defendants' fraudulent treatment protocol, Starrett City Medical, Hillcrest Medical, Ajudua, PT of NY, Shalaby, Cityworks PT, Kataeva, Handy PT, and Khallaf (along with the Management Defendants, the "PT Defendants") purported to subject many

Insureds to a series of physical therapy treatments at the Flatlands Avenue Medical Clinic and the Hillside Avenue Medical Clinic.

457.    Like Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatment were fraudulent in that the physical therapy treatment was performed – to the extent that it was performed at all – pursuant to the fraudulent treatment protocol established by Defendants.

458.    The charges for the physical therapy purportedly provided by the PT Defendants and billed to GEICO through Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, and Handy PT also misrepresented the PT Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance.

459.    In most cases, the PT Defendants purported to subject each Insured to dozens of physical therapy treatments over an extended time period, generally resulting in thousands of dollars of charges for each Insured.

460.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours.

461.    Nonetheless, pursuant to the Management Defendants' fraudulent treatment and billing protocol, following their initial examination and follow-up examinations, virtually every Insured was prescribed a medically unnecessary, extended course of physical therapy.

462.    The PT Defendants' charges for the physical therapy were predicated on the boilerplate "diagnoses" the Defendants provided to the Insureds following the initial and follow-up examinations, as well as the medically useless diagnostic tests.

463.     But for these contrived "diagnoses" and diagnostic tests, the PT Defendants would not have been able to submit charges for the physical therapy because they would have no way to justify the performance of the physical therapy.

**10.     The Unlawful Manipulation of the Fee Schedule For Chiropractic and Physical Therapy**

464.     In addition, Defendants improperly billed GEICO by circumventing the 8 allowable units for physical therapy per day under the Fee Schedule. For example, Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, and Handy PT provided and billed for physical therapy treatment rendered to Insureds on the same day that physical therapy was performed by and billed through Flatlands Chiropractic, Kings Chiropractic, Your Choice Chiropractic, All About Chiropractic, or J Park Chiropractic for those same Insureds.

465.     The Physical Medicine section of the Fee Schedule establishes ground rules that healthcare providers and insurers are required to follow when determining the permissible charge or reimbursement for a specific service. As it relates to physical therapy services and the scope of services relevant to the present dispute, Ground Rule 11 states:

> When multiple physical medicine procedures and/or modalities are performed on the same day, reimbursement is limited to 8.0 units or the amount billed, whichever is less. The following codes represent the physical medicine procedures and modalities subject to this rule:

| | | | | | |
|---|---|---|---|---|---|
| 97010 | 97012 | 97014 | 97016 | 97018 | 97022 |
| 97024 | 97026 | 97028 | 97032 | 97033 | 97034 |
| 97035 | 97036 | 97039 | 97110 | 97112 | 97113 |
| 97116 | 97124 | 97139 | 97140 | 97150 | 97530 |
| 97535 | 97537 | 97542 | 97760 | 97661 | 97662 |

466.     Pursuant to the Fee Schedule, the majority of the above referenced CPT codes and corresponding physical procedures are assigned a relative value unit. Therefore, a healthcare provider that provides physical therapy to an Insured cannot bill for and receive payment for any

combination of the above referenced physical therapy procedures performed on the same patient on the same day if the aggregate value of all of those procedures exceeds 8.0 units.

467.    In order to effectuate this scheme, Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, or Handy PT rendered basic physical therapy services to Insureds on the one hand while on the other hand, Flatlands Chiropractic, Kings Chiropractic, Your Choice Chiropractic, All About Chiropractic, or J Park Chiropractic rendered another form of physical therapy to the same Insureds on the same day. Despite the appearance of separate professional corporations providing services to the Insureds on the same day, the billing for those services was split among professional corporations to circumvent the limitations on the billing for physical therapy services.

468.    For example, Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, or Handy PT performed physical therapy to their patients utilizing CPT Codes 97124 (massage therapy), 97014 (electrical stimulation), and 97010 (hot/cold packs) - which have a cumulative relative value based on the Fee Schedule of 7.65.

469.    Nevertheless, Flatlands Chiropractic, Kings Chiropractic, Your Choice Chiropractic, All About Chiropractic, or J Park Chiropractic also rendered physical therapy treatment to the same patients on the same day and billed GEICO utilizing CPT Code 97139 (unlisted therapeutic procedure with a relative value of 2.89).

470.    Thus, at minimum, the cumulative relative value of the physical therapy rendered by Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, or Handy PT (7.65) and physical therapy treatment rendered by Flatlands Chiropractic, Kings Chiropractic, Your Choice Chiropractic, All About Chiropractic, or J Park Chiropractic (2.89) per day per patient was 10.54, consequently allowing these professional corporations to obtain additional monies above and

beyond the 8.0 allowable units of physical therapy they would be entitled to for each patient per day.

471.     Starrett City Medical, Hillcrest Medical, PT of NY, Cityworks PT, or Handy PT and Flatlands Chiropractic, Kings Chiropractic, Your Choice Chiropractic, All About Chiropractic, or J Park Chiropractic submitted their bills separately in an effort to confuse GEICO into issuing reimbursement despite the fact that one of the modalities of treatment is technically beyond the maximum daily allowable reimbursement.

**D.      Starrett City Medical and Hillcrest Medical's Fraudulent Billing for Independent Contractor Services**

472.     The Defendants' scheme also included submission of fraudulent claims to GEICO seeking payment for services performed by independent contractors.

473.     Under the New York No-Fault Law, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

474.     Since 2001, the New York State Department of Financial Services consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York No-Fault Law for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under no-fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent

himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

475.    Even so, Defendants routinely submitted charges to GEICO and other insurers on behalf of Starrett City Medical and Hillcrest Medical for Fraudulent Services that were provided, to the extent they were provided at all, by independent contractors.

476.    For instance, Starrett City Medical and Hillcrest Medical:

(i)      paid the per diem physicians on a 1099 basis;

(ii)     established an understanding with the per diem physicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to these per diem physicians;

(iv)     failed to secure and maintain W-4 or I-9 forms for these per diem physicians;

(v)      failed to withhold federal, state, or city taxes on behalf of these per diem physicians;

(vi)     compelled these per diem physicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted these per diem physicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted these per diem physicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)     failed to cover these per diem physicians for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State

Department of Taxation that these per diem physicians were independent contractors.

477.     By electing to treat these per diem physicians as independent contractors, Starrett City Medical and Hillcrest Medical realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

478.     Because these per diem physicians were independent contractors and performed the Fraudulent Services, Starrett City Medical and Hillcrest Medical never had any right to bill for or collect No-Fault Benefits in connection with those services.

479.     In keeping with the fact that these physicians were independent contractors, at all relevant times, they operated at multiple PCs, in addition to Starrett City Medical and Hillcrest Medical.

480.     Ajudua, Starrett City Medical, and Hillcrest Medical billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

481.    Ajudua, Starrett City Medical, and Hillcrest Medical's misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

482.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of charges (i.e., bills, NF-3 forms, HCFA-1500 forms) and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

483.    The bills and treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)    The bills and treatment reports uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional corporations that were fraudulently incorporated and/or unlawfully owned and controlled by the Management Defendants, and which illegally split fees with unlicensed individuals.

(ii)    The bills and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and rendered in accordance with the exercise of legitimate medical judgment by licensed professionals. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to predetermined fraudulent protocols controlled by laypersons and designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(iii)    The bills and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iv)    The bills and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Provider Defendants were in

compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

(v)     The bills and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to GEICO that the Provider Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, in certain cases, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits associated with the Fraudulent Services because the services were not provided by employees of the Provider Defendants but rather were performed by independent contractors.

III.     **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

484.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

485.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

486.    In fact, Defendants billed for the Fraudulent Services at the Flatlands Avenue Medical Clinic and Hillside Avenue Medical Clinic through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single entity or under any single tax identification number, thereby preventing GEICO from identifying the fraudulent scheme and the pattern of fraudulent charges submitted through any one entity.

487.    Specifically, Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently

incorporated and/or unlawfully controlled and that the Provider Defendants unlawfully split fees with unlicensed persons.

488.    Additionally, Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks for patient referrals.

489.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent predetermined protocols controlled by laypersons and designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

490.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were, in certain instances, purportedly provided by independent contractors and not by employees of the Provider Defendants.

491.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

492.    In accordance with the No-Fault Laws, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the

requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

493.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

494.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

495.    The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.

496.    As a result, GEICO incurred damages of more than $5,900,000.00 based upon the fraudulent charges.

497.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**<u>FIRST CAUSE OF ACTION</u>**
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§2201 and 2202)**

498.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

499.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $7,000,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through the Provider Defendants.

500.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities.

501.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided pursuant to predetermined fraudulent protocols controlled by laypersons and designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

502.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted through the Provider Defendants to GEICO.

503.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because the Provider Defendants unlawfully split fees and/or engaged in unlawful kickback arrangements with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

504.    The Provider Defendants have no right to receive payment from GEICO on the unpaid billing because, in many instances, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors and not by employees of the Provider Defendants.

505.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO through the Provider Defendants.

## SECOND CAUSE OF ACTION
**Against Ajudua and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

506.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

507.     Starrett City Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

508.     Ajudua and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Starrett City Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Starrett City Medical was not eligible to receive under the New York No-Fault insurance law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) the billed-for-services, in many instances, were performed by independent contractors and not employees of Starrett City Medical. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

509.    Starrett City Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Ajudua and the Management Defendants operated Starrett City Medical, insofar as Starrett City Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Starrett City Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Ajudua and the Management Defendants continue to attempt to collect on the fraudulent billing submitted through Starrett City Medical to the present day.

510.    Starrett City Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Starrett City Medical likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Starrett City Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

511.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $1,055,000.00 pursuant to the fraudulent bills submitted through Starrett City Medical.

512.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Ajudua and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

513. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

514. Starrett City Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

515. Ajudua and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Starrett City Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Starrett City Medical was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) the billed-for-services, in many instances, were performed by independent contractors and not employees of Starrett City Medical. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

516.     Ajudua and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

517.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $1,055,000.00 pursuant to the fraudulent bills submitted through Starrett City Medical.

518.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
**Against Starrett City Medical, Ajudua, and the Management Defendants
(Common Law Fraud)**

519.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

520.     Starrett City Medical, Ajudua, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

521.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Starrett City Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Starrett City Medical was properly licensed, and therefore, eligible to receive No-Fault

Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants; and (iv) in every claim, the representation that Starrett City Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact, in many instances, the billed-for-services were performed – to the extent they were performed at all – by independent contractors and not employees of Starrett City Medical.

522. Starrett City Medical, Ajudua, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Starrett City Medical that were not compensable under New York No-Fault Law.

523. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $1,055,000.00 pursuant to the fraudulent bills submitted by Defendants through Starrett City Medical.

524. Starrett City Medical, Ajudua, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

525.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Starrett City Medical, Ajudua, and the Management Defendants
### (Unjust Enrichment)

526.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

527.    As set forth above, Starrett City Medical, Ajudua, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

528.    When GEICO paid the bills and charges submitted by or on behalf of Starrett City Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Starrett City Medical, Ajudua, and the Management Defendants' improper, unlawful, and/or unjust acts.

529.    Starrett City Medical, Ajudua, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

530.    Starrett City Medical, Ajudua, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

531.    By reason of the above, Starrett City Medical, Ajudua, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,055,000.00.

**SIXTH CAUSE OF ACTION**
**Against Hillcrest Medical, Ajudua, and the Management Defendants**
**(Common Law Fraud)**

532.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

533.    Hillcrest Medical, Ajudua, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

534.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Hillcrest Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Hillcrest Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants; and (iv) in every claim, the representation that Hillcrest Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact, in many instances, the billed-for-services were performed – to the extent they were

performed at all – by independent contractors and not employees of Hillcrest Medical. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "2".

535.    Hillcrest Medical, Ajudua, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hillcrest Medical that were not compensable under New York No-Fault Law.

536.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $829,000.00 pursuant to the fraudulent bills submitted by Defendants through Hillcrest Medical.

537.    Hillcrest Medical, Ajudua, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

538.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Hillcrest Medical, Ajudua, and the Management Defendants**
**(Unjust Enrichment)**

539.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

540.    As set forth above, Hillcrest Medical, Ajudua, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

541.    When GEICO paid the bills and charges submitted by or on behalf of Hillcrest

Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on Hillcrest Medical, Ajudua, and the Management Defendants' improper,

unlawful, and/or unjust acts.

542.    Hillcrest Medical, Ajudua, and the Management Defendants have been enriched at

GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily

accepted notwithstanding their improper, unlawful, and unjust billing scheme.

543.    Hillcrest Medical, Ajudua, and the Management Defendants' retention of GEICO's

payments violates fundamental principles of justice, equity and good conscience.

544.    By reason of the above, Hillcrest Medical, Ajudua, and the Management

Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less

than $829,000.00.

### EIGHTH CAUSE OF ACTION
**Against Flatlands Chiropractic, Luna, and the Management Defendants**
**(Common Law Fraud)**

545.    GEICO incorporates, as though fully set forth herein, each and every allegation set

forth above.

546.    Flatlands Chiropractic, Luna, and the Management Defendants intentionally and

knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of thousands of fraudulent charges seeking

payment for the Fraudulent Services.

547.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Flatlands Chiropractic was properly

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Flatlands Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "3".

548.    Flatlands Chiropractic, Luna, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Flatlands Chiropractic that were not compensable under New York No-Fault Law.

549.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $211,000.00 pursuant to the fraudulent bills submitted by Defendants through Flatlands Chiropractic.

550.    Flatlands Chiropractic, Luna, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

551.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
**Against Flatlands Chiropractic, Luna, and the Management Defendants**
**(Unjust Enrichment)**

552.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

553.     As set forth above, Flatlands Chiropractic, Luna, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

554.     When GEICO paid the bills and charges submitted by or on behalf of Flatlands Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Flatlands Chiropractic, Luna, and the Management Defendants' improper, unlawful, and/or unjust acts.

555.     Flatlands Chiropractic, Luna, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

556.     Flatlands Chiropractic, Luna, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

557.     By reason of the above, Flatlands Chiropractic, Luna, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $211,000.00.

**TENTH CAUSE OF ACTION**
**Against Luna and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

558.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

559.     Kings Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

560.     Luna and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Kings Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Kings Chiropractic was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

561.     Kings Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud

are the regular way in which Luna and the Management Defendants operated Kings Chiropractic, insofar as Kings Chiropractic is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Kings Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Luna and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Kings Chiropractic to the present day.

562.    Kings Chiropractic is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Kings Chiropractic likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Kings Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

563.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $164,000.00 pursuant to the fraudulent bills submitted through Kings Chiropractic.

564.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Luna and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

565.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

566.    Kings Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

567.    Luna and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Kings Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Kings Chiropractic was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

568.    Luna and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

569.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $164,000.00 pursuant to the fraudulent bills submitted through Kings Chiropractic.

570.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Kings Chiropractic, Luna, and the Management Defendants**
**(Common Law Fraud)**

571.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

572.    Kings Chiropractic, Luna, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

573.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kings Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Kings Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits

pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

574.    Kings Chiropractic, Luna, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kings Chiropractic that were not compensable under New York No-Fault Law.

575.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $164,000.00 pursuant to the fraudulent bills submitted by Defendants through Kings Chiropractic.

576.    Kings Chiropractic, Luna, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

577.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Kings Chiropractic, Luna, and the Management Defendants
### (Unjust Enrichment)

578.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

579.    As set forth above, Kings Chiropractic, Luna, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

580.    When GEICO paid the bills and charges submitted by or on behalf of Kings Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Kings Chiropractic, Luna, and the Management Defendants' improper, unlawful, and/or unjust acts.

581.    Kings Chiropractic, Luna, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

582.    Kings Chiropractic, Luna, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

583.    By reason of the above, Kings Chiropractic, Luna, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $164,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Wu and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

584.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

585.   Jeff Harmonize Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

586.   Wu and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Jeff Harmonize Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Jeff Harmonize Acupuncture was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

587.   Jeff Harmonize Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Wu and the Management Defendants operated Jeff Harmonize Acupuncture, insofar as Jeff Harmonize Acupuncture is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Jeff Harmonize Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Wu and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Jeff Harmonize Acupuncture to the present day.

588.    Jeff Harmonize Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Jeff Harmonize Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Jeff Harmonize Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

589.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $280,000.00 pursuant to the fraudulent bills submitted through Jeff Harmonize Acupuncture.

590.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Wu and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

591.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

592.    Jeff Harmonize Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

593.    Wu and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Jeff Harmonize Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Jeff Harmonize Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5.

594.    Wu and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

595.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $280,000.00 pursuant to the fraudulent bills submitted through Jeff Harmonize Acupuncture.

596.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTEENTH CAUSE OF ACTION
**Against Jeff Harmonize Acupuncture, Wu, and the Management Defendants**
**(Common Law Fraud)**

597.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

598.     Jeff Harmonize Acupuncture, Wu, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

599.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Jeff Harmonize Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Jeff Harmonize Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

600.    Jeff Harmonize Acupuncture, Wu, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jeff Harmonize Acupuncture that were not compensable under New York No-Fault Law.

601.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $280,000.00 pursuant to the fraudulent bills submitted by Defendants through Jeff Harmonize Acupuncture.

602.    Jeff Harmonize Acupuncture, Wu, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

603.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Jeff Harmonize Acupuncture, Wu, and the Management Defendants
### (Unjust Enrichment)

604.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

605.    As set forth above, Jeff Harmonize Acupuncture, Wu, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

606.    When GEICO paid the bills and charges submitted by or on behalf of Jeff Harmonize Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated

to make such payments based on Jeff Harmonize Acupuncture, Wu, and the Management

Defendants' improper, unlawful, and/or unjust acts.

607. Jeff Harmonize Acupuncture, Wu, and the Management Defendants have been

enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants

voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

608. Jeff Harmonize Acupuncture, Wu, and the Management Defendants' retention of

GEICO's payments violates fundamental principles of justice, equity and good conscience.

609. By reason of the above, Jeff Harmonize Acupuncture, Wu, and the Management

Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less

than $280,000.00.

### EIGHTEENTH CAUSE OF ACTION
**Against Moon and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

610. GEICO incorporates, as though fully set forth herein, each and every allegation set

forth above.

611. SJM Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. §

1961(4), that engages in activities that affected interstate commerce.

612. Moon and the Management Defendants knowingly have conducted and/or

participated, directly or indirectly, in the conduct of SJM Acupuncture's affairs through a pattern

of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted thousands

of fraudulent charges on a continuous basis since its inception seeking payments that SJM

Acupuncture was not eligible to receive under the New York No-Fault Law because: (i) it was

unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-

splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

613.    SJM Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moon and the Management Defendants operated SJM Acupuncture, insofar as SJM Acupuncture is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for SJM Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Moon and the Management Defendants continue to attempt collection on the fraudulent billing submitted through SJM Acupuncture to the present day.

614.    SJM Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. SJM Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful

acts are taken by SJM Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

615.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $499,000.00 pursuant to the fraudulent bills submitted through SJM Acupuncture.

616.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Wu and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

617.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

618.    SJM Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

619.    Moon and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of SJM Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that SJM Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant

to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

620.    Moon and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

621.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $499,000.00 pursuant to the fraudulent bills submitted through SJM Acupuncture.

622.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against SJM Acupuncture, Moon, and the Management Defendants
### (Common Law Fraud)

623.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

624.    SJM Acupuncture, Moon, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

625.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that SJM Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that SJM Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

626.    SJM Acupuncture, Moon, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SJM Acupuncture that were not compensable under New York No-Fault Law.

627.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $499,000.00 pursuant to the fraudulent bills submitted by Defendants through SJM Acupuncture.

628.    SJM Acupuncture, Moon, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

629.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against SJM Acupuncture, Moon, and the Management Defendants**
**(Unjust Enrichment)**

630.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

631.     As set forth above, SJM Acupuncture, Moon, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

632.     When GEICO paid the bills and charges submitted by or on behalf of SJM Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on SJM Acupuncture, Moon, and the Management Defendants' improper, unlawful, and/or unjust acts.

633.     SJM Acupuncture, Moon, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

634.     SJM Acupuncture, Moon, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

635.     By reason of the above, SJM Acupuncture, Moon, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $499,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Krupnova and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

636.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

637.    LK Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

638.    Krupnova and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of LK Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its formation seeking payments that LK Acupuncture was not eligible to receive under the New York No-Fault insurance law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

639.    LK Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud

are the regular way in which Krupnova and the Management Defendants operated LK Acupuncture, insofar as LK Acupuncture is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for LK Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Krupnova and the Management Defendants continue to attempt collection on the fraudulent billing submitted through LK Acupuncture to the present day.

640.    LK Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. LK Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LK Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

641.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $24,000.00 pursuant to the fraudulent bills submitted through LK Acupuncture.

642.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Krupnova and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

643.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

644.    LK Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

645.    Krupnova and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of LK Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that LK Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

646.     Krupnova and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

647.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $24,000.00 pursuant to the fraudulent bills submitted through LK Acupuncture.

648.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
**Against LK Acupuncture, Krupnova, and the Management Defendants**
**(Common Law Fraud)**

649.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

650.     LK Acupuncture, Krupnova, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

651.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that LK Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that LK Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits

pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

652.    LK Acupuncture, Krupnova, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LK Acupuncture that were not compensable under New York No-Fault Law.

653.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $24,000.00 pursuant to the fraudulent bills submitted by Defendants through LK Acupuncture.

654.    LK Acupuncture, Krupnova, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

655.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against LK Acupuncture, Krupnova, and the Management Defendants
### (Unjust Enrichment)

656.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

657.    As set forth above, LK Acupuncture, Krupnova, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

658.    When GEICO paid the bills and charges submitted by or on behalf of LK Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on LK Acupuncture, Krupnova, and the Management Defendants' improper, unlawful, and/or unjust acts.

659.    LK Acupuncture, Krupnova, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

660.    LK Acupuncture, Krupnova, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

661.    By reason of the above, LK Acupuncture, Krupnova, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $24,000.00.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Lawson and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

662.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

663. PL Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

664. Lawson and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of PL Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its formation seeking payments that PL Acupuncture was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

665. PL Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lawson and the Management Defendants operated PL Acupuncture, insofar as PL Acupuncture is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for PL Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of

criminal activity, as does the fact that Lawson and the Management Defendants continue to attempt collection on the fraudulent billing submitted through PL Acupuncture to the present day.

666.   PL Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. PL Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by PL Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

667.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $258,000.00 pursuant to the fraudulent bills submitted through PL Acupuncture.

668.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-SEVENTH CAUSE OF ACTION
**Against Lawson and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

669.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

670.   PL Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

671.     Lawson and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of PL Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that PL Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

672.     Lawson and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

673.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $258,000.00 pursuant to the fraudulent bills submitted through PL Acupuncture.

674.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against PL Acupuncture, Lawson, and the Management Defendants
### (Common Law Fraud)

675.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

676.     PL Acupuncture, Lawson, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

677.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that PL Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that PL Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

678.     PL Acupuncture, Lawson, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PL Acupuncture that were not compensable under New York No-Fault Law.

679.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $258,000.00 pursuant to the fraudulent bills submitted by Defendants through PL Acupuncture.

680.     PL Acupuncture, Lawson, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

681.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
**Against PL Acupuncture, Lawson, and the Management Defendants**
**(Unjust Enrichment)**

682.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

683.     As set forth above, PL Acupuncture, Lawson, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

684.     When GEICO paid the bills and charges submitted by or on behalf of PL Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make

such payments based on PL Acupuncture, Lawson, and the Management Defendants' improper, unlawful, and/or unjust acts.

685.    PL Acupuncture, Lawson, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

686.    PL Acupuncture, Lawson, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

687.    By reason of the above, PL Acupuncture, Lawson, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $258,000.00.

### THIRTIETH CAUSE OF ACTION
**Against Handy PT, Khallaf, and the Management Defendants**
**(Common Law Fraud)**

688.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

689.    Handy PT, Khallaf, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

690.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Handy PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Handy PT

was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "9".

691.     Handy PT, Khallaf, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Handy PT that were not compensable under New York No-Fault Law.

692.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $192,000.00 pursuant to the fraudulent bills submitted by Defendants through Handy PT.

693.     Handy PT, Khallaf, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

694.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-FIRST CAUSE OF ACTION
#### Against Handy PT, Khallaf, and the Management Defendants
#### (Unjust Enrichment)

695.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

696.    As set forth above, Handy PT, Khallaf, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

697.    When GEICO paid the bills and charges submitted by or on behalf of Handy PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Handy PT, Khallaf, and the Management Defendants' improper, unlawful, and/or unjust acts.

698.    Handy PT, Khallaf, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

699.    Handy PT, Khallaf, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

700.    By reason of the above, Handy PT, Khallaf, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $192,000.00.

### THIRTY-SECOND CAUSE OF ACTION
#### Against Kataeva and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(c))

701.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

702.    Cityworks PT is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

703.    Kataeva and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Cityworks PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Cityworks PT was not eligible to receive under the New York No-Fault insurance law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10".

704.    Cityworks PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kataeva and the Management Defendants operated Cityworks PT, insofar as Cityworks PT is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Cityworks PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Kataeva and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Cityworks PT to the present day.

705.    Cityworks PT is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Cityworks PT likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Cityworks PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

706.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $565,000.00 pursuant to the fraudulent bills submitted through Cityworks PT.

707.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-THIRD CAUSE OF ACTION
### Against Kataeva and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

708.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

709.    Cityworks PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

710.    Kataeva and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Cityworks PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Cityworks PT was not entitled to receive under the New York No-Fault laws because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10".

711.    Kataeva and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

712.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $565,000.00 pursuant to the fraudulent bills submitted through Cityworks PT.

713.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Cityworks PT, Kataeva, and the Management Defendants
### (Common Law Fraud)

714.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

715.    Cityworks PT, Kataeva, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

716.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Cityworks PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Cityworks PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

717.    Cityworks PT, Kataeva, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort

to induce GEICO to pay charges submitted through Cityworks PT that were not compensable under New York No-Fault Law.

718.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $565,000.00 pursuant to the fraudulent bills submitted by Defendants through Cityworks PT.

719.    Cityworks PT, Kataeva, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

720.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY -FIFTH CAUSE OF ACTION
### Against Cityworks PT, Kataeva, and the Management Defendants
### (Unjust Enrichment)

721.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

722.    As set forth above, Cityworks PT, Kataeva, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

723.    When GEICO paid the bills and charges submitted by or on behalf of Cityworks PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Cityworks PT, Kataeva, and the Management Defendants' improper, unlawful, and/or unjust acts.

724.     Cityworks PT, Kataeva, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

725.     Cityworks PT, Kataeva, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

726.     By reason of the above, Cityworks, Kataeva, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $565,000.00.

**THIRTY -SIXTH CAUSE OF ACTION**
**Against Park and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

727.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

728.     Your Choice Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

729.     Park and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Your Choice Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Your Choice Chiropractic was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes

used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11".

730.    Your Choice Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Park and the Management Defendants operated Your Choice Chiropractic, insofar as Your Choice Chiropractic is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Your Choice Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Park and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Your Choice Chiropractic to the present day.

731.    Your Choice Chiropractic is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Your Choice Chiropractic likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Your Choice Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

732.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $206,000.00 pursuant to the fraudulent bills submitted through Your Choice Chiropractic.

733.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY -SEVENTH CAUSE OF ACTION**
**Against Park and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

734.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

735.     Your Choice Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

736.     Park and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Your Choice Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Your Choice Chiropractic was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services

that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11".

737.    Park and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

738.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $206,000.00 pursuant to the fraudulent bills submitted through Your Choice Chiropractic.

739.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY -EIGHTH CAUSE OF ACTION**
**Against Your Choice Chiropractic, Park, and the Management Defendants**
**(Common Law Fraud)**

740.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

741.    Your Choice Chiropractic, Park, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

742.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Your Choice Chiropractic was

properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Your Choice Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

743.    Your Choice Chiropractic, Park, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Your Choice Chiropractic that were not compensable under New York No-Fault Law.

744.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $206,000.00 pursuant to the fraudulent bills submitted by Defendants through Your Choice Chiropractic.

745.    Your Choice Chiropractic, Park, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

746.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY -NINTH CAUSE OF ACTION**
**Against Your Choice Chiropractic, Park, and the Management Defendants**
**(Unjust Enrichment)**

747.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

748.    As set forth above, Your Choice Chiropractic, Park, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

749.    When GEICO paid the bills and charges submitted by or on behalf of Your Choice Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Your Choice Chiropractic, Park, and the Management Defendants' improper, unlawful, and/or unjust acts.

750.    Your Choice Chiropractic, Park, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

751.    Your Choice Chiropractic, Park, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

752.    By reason of the above, Your Choice Chiropractic, Park, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $206,000.00.

## FORTIETH CAUSE OF ACTION
### Against Park and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

753.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

754.    All About Chiropractic is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

755.    Park and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of All About Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that All About Chiropractic Medical was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) the billed-for-services, in many instances, were performed by independent contractors and not employees of All About Chiropractic. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit"12".

756.   All About Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Park and the Management Defendants operated All About Chiropractic, insofar as All About Chiropractic is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for All About Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Park and the Management Defendants continue to attempt to collect on the fraudulent billing submitted through All About Chiropractic to the present day.

757.   All About Chiropractic is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. All About Chiropractic likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by All About Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

758.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $228,000.00 pursuant to the fraudulent bills submitted through All About Chiropractic.

759.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-FIRST CAUSE OF ACTION
### Against Park and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

760.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

761.    All About Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

762.    Park and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of All About Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that All About Chiropractic was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) the billed-for-services, in many instances, were performed by independent contractors and not employees of All About Chiropractic. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "12".

763. Park and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

764. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $228,000.00 pursuant to the fraudulent bills submitted through All About Chiropractic.

765. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SECOND CAUSE OF ACTION
### Against All About Chiropractic, Park, and the Management Defendants
### (Common Law Fraud)

766. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

767. All About Chiropractic, Park, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

768. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that All About Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that All About Chiropractic was properly licensed, and therefore, eligible to receive No-Fault

Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

769.    All About Chiropractic, Park, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through All About Chiropractic that were not compensable under New York No-Fault Law.

770.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $228,000.00 pursuant to the fraudulent bills submitted by Defendants through All About Chiropractic.

771.    All About Chiropractic, Park, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

772.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FORTY-THIRD CAUSE OF ACTION**
**Against Your Choice Chiropractic, Park, and the Management Defendants**
**(Unjust Enrichment)**

773.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

774.    As set forth above, All About Chiropractic, Park, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

775.    When GEICO paid the bills and charges submitted by or on behalf of All About Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on All About Chiropractic, Park, and the Management Defendants' improper, unlawful, and/or unjust acts.

776.    All About Chiropractic, Park, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

777.    All About Chiropractic, Park, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

778.    By reason of the above, All About Chiropractic, Park, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $228,000.00.

**FORTY-FOURTH CAUSE OF ACTION**
**Against J Park Chiropractic, Park, and the Management Defendants**
**(Common Law Fraud)**

779.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

780.    J Park Chiropractic, Park, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

781.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that J Park Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that J Park Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "13".

782.    J Park Chiropractic, Park, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through J Park Chiropractic that were not compensable under New York No-Fault Law.

783.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $72,000.00 pursuant to the fraudulent bills submitted by Defendants through J Park Chiropractic.

784.    J Park Chiropractic, Park, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

785.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-FIFTH CAUSE OF ACTION
### Against J Park Chiropractic, Park, and the Management Defendants
### (Unjust Enrichment)

786.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

787.    As set forth above, J Park Chiropractic, Park, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

788.    When GEICO paid the bills and charges submitted by or on behalf of J Park Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on J Park Chiropractic, Park, and the Management Defendants' improper, unlawful, and/or unjust acts.

789.    J Park Chiropractic, Park, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

790.    J Park Chiropractic, Park, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

791.    By reason of the above, J Park Chiropractic, Park, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $72,000.00.

**FORTY-SIXTH CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

792.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

793.    Choi Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

794.    Choi and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Choi Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Choi Acupuncture was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14".

795.    Choi Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Choi and the Management Defendants operated Choi Acupuncture, insofar as Choi Acupuncture is not engaged in a legitimate acupuncture practice, and acts of mail fraud therefore are essential in order for Choi Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Choi and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Choi Acupuncture to the present day.

796.    Choi Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Choi Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Choi Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

797.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $201,000.00 pursuant to the fraudulent bills submitted through Choi Acupuncture.

798.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FORTY-SEVENTH CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

799.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

800.    Choi Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

801.    Choi and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Choi Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Choi Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of

racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14".

802.    Choi and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

803.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $201,000.00 pursuant to the fraudulent bills submitted through Choi Acupuncture.

804.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-EIGHTH CAUSE OF ACTION
### Against Choi Acupuncture, Choi, and the Management Defendants
### (Common Law Fraud)

805.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

806.    Choi Acupuncture, Choi, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

807.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Choi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or

actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Choi Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR  § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

808.    Choi Acupuncture, Choi, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Choi Acupuncture that were not compensable under New York No-Fault Law.

809.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $201,000.00 pursuant to the fraudulent bills submitted by Defendants through Choi Acupuncture.

810.    Choi Acupuncture, Choi, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

811.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FORTY-NINTH CAUSE OF ACTION**
**Against Choi Acupuncture, Choi, and the Management Defendants**
**(Unjust Enrichment)**

812.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

813.    As set forth above, Choi Acupuncture, Choi, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

814.    When GEICO paid the bills and charges submitted by or on behalf of Choi Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Choi Acupuncture, Choi, and the Management Defendants' improper, unlawful, and/or unjust acts.

815.    Choi Acupuncture, Choi, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

816.    Choi Acupuncture, Choi, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

817.    By reason of the above, Choi Acupuncture, Choi, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $201,000.00.

**FIFTIETH CAUSE OF ACTION**
**Against Choi and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

818.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

819.     Choice Acupuncture is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

820.     Choi and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Choice Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Choice Acupuncture was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15".

821.     Choice Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Choi and the Management Defendants operated Choice Acupuncture, insofar as Choice Acupuncture is not engaged in a legitimate acupuncture practice, and acts of mail fraud therefore are essential in order for Choice Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a

continued threat of criminal activity, as does the fact that Choi and the Management Defendants continue to attempt collection on the fraudulent billing submitted through Choice Acupuncture to the present day.

822.    Choice Acupuncture is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Choice Acupuncture likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Choice Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

823.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $426,000.00 pursuant to the fraudulent bills submitted through Choice Acupuncture.

824.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTY-FIRST CAUSE OF ACTION
### Against Choi and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

825.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

826.    Choice Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

827.    Choi and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Choice Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Choice Acupuncture was not entitled to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15".

828.    Choi and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

829.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $426,000.00 pursuant to the fraudulent bills submitted through Choice Acupuncture.

830.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTY-SECOND CAUSE OF ACTION**
**Against Choice Acupuncture, Choi, and the Management Defendants**
**(Common Law Fraud)**

831.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

832.     Choice Acupuncture, Choi, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

833.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Choice Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Choice Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

834.    Choice Acupuncture, Choi, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Choice Acupuncture that were not compensable under New York No-Fault Law.

835.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $426,000.00 pursuant to the fraudulent bills submitted by Defendants through Choice Acupuncture.

836.    Choice Acupuncture, Choi, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

837.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTY-THIRD CAUSE OF ACTION
### Against Choice Acupuncture, Choi, and the Management Defendants
### (Unjust Enrichment)

838.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

839.    As set forth above, Choice Acupuncture, Choi, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

840.    When GEICO paid the bills and charges submitted by or on behalf of Choice Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make

such payments based on Choice Acupuncture, Choi, and the Management Defendants' improper, unlawful, and/or unjust acts.

841. Choice Acupuncture, Choi, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

842. Choice Acupuncture, Choi, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

843. By reason of the above, Choice Acupuncture, Choi, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $426,000.00.

**FIFTY-FOURTH CAUSE OF ACTION**
**Against Choi-Go Acupuncture, Choi, and the Management Defendants**
**(Common Law Fraud)**

844. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

845. Choi-Go Acupuncture, Choi, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

846. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Choi-Go Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation

that Choi-Go Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants. The fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "16".

847.    Choi-Go Acupuncture, Choi, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Choi-Go Acupuncture that were not compensable under New York No-Fault Law.

848.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $142,000.00 pursuant to the fraudulent bills submitted by Defendants through Choi-Go Acupuncture.

849.    Choi-Go Acupuncture, Choi, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

850.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTY-FIFTH CAUSE OF ACTION
### Against Choi-Go Acupuncture, Choi, and the Management Defendants
### (Unjust Enrichment)

851.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

852.    As set forth above, Choi-Go Acupuncture, Choi, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

853.    When GEICO paid the bills and charges submitted by or on behalf of Choi-Go Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Choi-Go Acupuncture, Choi, and the Management Defendants' improper, unlawful, and/or unjust acts.

854.    Choi-Go Acupuncture, Choi, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

855.    Choi-Go Acupuncture, Choi, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

856.    By reason of the above, Choi-Go Acupuncture, Choi, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $142,000.00.

## FIFTY-SIXTH CAUSE OF ACTION
### Against Shalaby and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

857.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

858.    PT of NY is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

859.    Shalaby and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of PT of NY's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that PT of NY was not eligible to receive under the New York No-Fault Law because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "17".

860.    PT of NY's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shalaby and the Management Defendants operated PT of NY, insofar as PT of NY is not engaged in a legitimate acupuncture practice, and acts of mail fraud therefore are essential in order for PT of NY to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as

does the fact that Shalaby and the Management Defendants continue to attempt collection on the fraudulent billing submitted through PT of NY to the present day.

861.    PT of NY is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently owned and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. PT of NY likewise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by PT of NY in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

862.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $572,000.00 pursuant to the fraudulent bills submitted through PT of NY.

863.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTY-SEVENTH CAUSE OF ACTION**
**Against Shalaby and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

864.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

865.    PT of NY is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

866.     Shalaby and the Management Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of PT of NY's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that PT of NY was not entitled to receive under the New York No-Fault Laws because: (i) it was unlawfully licensed, owned, and/or controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons and paid illegal kickbacks for patient referrals; (iii) the billed-for-services were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; and (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "17".

867.     Shalaby and the Management Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

868.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $572,000.00 pursuant to the fraudulent bills submitted through PT of NY.

869.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTY-EIGHTH CAUSE OF ACTION
### Against PT of NY, Shalaby, and the Management Defendants
### (Common Law Fraud)

870.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

871.    PT of NY, Shalaby, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

872.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that PT of NY was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and/or actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that PT of NY was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting and kickback arrangements with non-medical professionals; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich Defendants.

873.    PT of NY, Shalaby, and the Management Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PT of NY that were not compensable under New York no-fault insurance laws.

874.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $572,000.00 pursuant to the fraudulent bills submitted by Defendants through PT of NY.

875.    PT of NY, Shalaby, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

876.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTY-NINTH CAUSE OF ACTION
### Against PT of NY, Shalaby, and the Management Defendants
### (Unjust Enrichment)

877.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

878.    As set forth above, PT of NY, Shalaby, and the Management Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

879.    When GEICO paid the bills and charges submitted by or on behalf of PT of NY for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments

based on PT of NY, Shalaby, and the Management Defendants' improper, unlawful, and/or unjust acts.

880.    PT of NY, Shalaby, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

881.    PT of NY, Shalaby, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

882.    By reason of the above, PT of NY, Shalaby, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $572,000.00.

## JURY DEMAND

883.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Ajudua and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,055,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Ajudua and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$1,055,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Starrett City Medical, Ajudua, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $1,055,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Starrett City Medical, Ajudua, and the Management Defendants, more than $1,055,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Hillcrest Medical, Ajudua, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $829,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Hillcrest Medical, Ajudua, and the Management Defendants, more than $829,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Flatlands Chiropractic, Luna, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $211,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Flatlands Chiropractic, Luna, and the Management Defendants, more than $211,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Luna and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $164,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Luna and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $164,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Kings Chiropractic, Luna, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $164,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Kings Chiropractic, Luna, and the Management Defendants, more than $164,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Wu and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $280,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Wu and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $280,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.     On the Sixteenth Cause of Action against Jeff Harmonize Acupuncture, Wu, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $280,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.     On the Seventeenth Cause of Action against Jeff Harmonize Acupuncture, Wu, and the Management Defendants, more than $280,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.     On the Eighteenth Cause of Action against Moon and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $499,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.     On the Nineteenth Cause of Action against Moon and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $499,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.     On the Twentieth Cause of Action against SJM Acupuncture, Moon, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $499,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.     On the Twenty-First Cause of Action against SJM Acupuncture, Moon, and the Management Defendants, more than $499,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Krupnova and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $24,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Krupnova and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $24,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against LK Acupuncture, Krupnova, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $24,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against LK Acupuncture, Krupnova, and the Management Defendants, more than $24,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against Lawson and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $258,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.     On the Twenty-Seventh Cause of Action against Lawson and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $258,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against PL Acupuncture, Lawson, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $258,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.     On the Twenty-Ninth Cause of Action against PL Acupuncture, Lawson, and the Management Defendants, more than $258,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Handy PT, Khallaf, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $192,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against Handy PT, Khallaf, and the Management Defendants, more than $192,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second Cause of Action against Kataeva and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $565,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Third Cause of Action against Kataeva and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $565,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.    On the Thirty-Fourth Cause of Action against Cityworks PT, Kataeva, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $565,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

II.    On the Thirty-Fifth Cause of Action against Cityworks PT, Kataeva, and the Management Defendants, more than $565,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

JJ.    On the Thirty-Sixth Cause of Action against Park and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $206,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

KK.    On the Thirty-Seventh Cause of Action against Park and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $206,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL.    On the Thirty-Eighth Cause of Action against Your Choice Chiropractic, Park, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $206,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

MM.    On the Thirty-Ninth Cause of Action against Your Choice Chiropractic, Park, and the Management Defendants, more than $206,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

NN.     On the Fortieth Cause of Action Park and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $228,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

OO.     On the Forty-First Cause of Action against Park and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $228,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

PP.     On the Forty-Second Cause of Action against All About Chiropractic, Park, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $228,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.     On the Forty-Third Cause of Action against All About Chiropractic, Park, and the Management Defendants, more than $228,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

RR.     On the Forty-Fourth Cause of Action against J Park Chiropractic, Park, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $72,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

SS.     On the Forty-Fifth Cause of Action against J Park Chiropractic, Park, and the Management Defendants, more than $72,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

TT.     On the Forty-Sixth Cause of Action against Choi and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $201,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

UU.     On the Forty-Seventh Cause of Action against Choi and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $201,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

VV.     On the Forty-Eighth Cause of Action against Choi Acupuncture, Choi, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $201,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

WW.     On the Forty-Ninth Cause of Action against Choi Acupuncture, Choi, and the Management Defendants, more than $201,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

XX.     On the Fiftieth Cause of Action against Choi and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

YY.     On the Fifty-First Cause of Action against Choi and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

ZZ.      On the Fifty-Second Cause of Action against Choice Acupuncture, Choi, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $426,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AAA.   On the Fifty-Third Cause of Action against Choice Acupuncture, Choi, and the Management Defendants, more than $426,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

BBB.   On the Fifty-Fourth Cause of Action against Choi-Go Acupuncture, Choi, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $142,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CCC.   On the Fifty-Fifth Cause of Action against Choi-Go Acupuncture, Choi, and the Management Defendants, more than $142,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

DDD.  On the Fifty-Sixth Cause of Action against Shalaby and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $572,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EEE.   On the Fifty-Seventh Cause of Action against Shalaby and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $572,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FFF.   On the Fifty-Eighth Cause of Action against PT of NY, Shalaby, and the Management Defendants, compensatory damages in favor of GEICO  an amount to be determined at trial but in excess of $527,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

GGG.  On the Fifty-Ninth Cause of Action against PT of NY, Shalaby, and the Management Defendants, more than $527,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated:  January 5, 2021

RIVKIN RADLER LLP

By: /S/    Barry I.  Levy
        Barry I. Levy, Esq.
        Frank P. Tiscione, Esq.
        Colleen O'Neil, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

4924201